**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOHN MILWITT,
*Defendant-Appellant.*

No. 05-10344

D.C. No.
CR-04-00002-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
February 14, 2006—San Francisco, California

Filed February 5, 2007

Before: J. Clifford Wallace, Michael Daly Hawkins, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge Wallace

**COUNSEL**

Michael Shepard and James Mink, Heller Ehrman LLP, San Francisco, California, for the defendant-appellant.

Kevin V. Ryan, Barbara Valliere, and Shawna Yen, United States Attorney's Office, San Jose, California, for the plaintiff-appellee.

**OPINION**

THOMAS, Circuit Judge:

John Milwitt ("Milwitt") appeals his conviction of five counts of bankruptcy fraud and his sentence of twenty-four months imprisonment and three years supervised release. Milwitt challenges his conviction on several bases, including sufficiency of the evidence. Because the evidence presented was insufficient to sustain the verdict, we reverse the conviction.

I

Sometime prior to March 1997, Milwitt placed an advertisement in the yellow pages of the phone book under the

headings of "Attorneys" and "Landlord Tenant Law." The advertisement was for a company called "AP Assistance" and suggested that the company could provide both legal services through attorneys as well as assistance for individuals representing themselves. The advertisement was one of the few, if not the only, that explicitly mentioned "tenants' rights." Milwitt never attended law school and has never been admitted to practice law.

Based on the advertisement in the yellow pages, several tenants, including the six tenants described in the indictment, who were having problems with their landlords, contacted Milwitt. The tenants paid Milwitt varying amounts of money for his assistance with defending their unlawful detainer actions. Each of the tenants testified that Milwitt represented himself as an attorney and that he seemed to know what he was talking about. Milwitt advised the tenants that they were entitled to withhold rent from their landlords. In addition, Milwitt told one of the tenants that she could use money that she withheld from her landlord to pay his fees.

Milwitt collected fees from each of the tenants. The tenants believed that Milwitt was going to represent them in unlawful detainer actions filed against them by their landlords. Although Milwitt collected fees from the tenants with the understanding that he would represent them in court, Milwitt only filed papers on their behalf. He did not appear in court for any of the unlawful detainer actions, and default judgments were entered in favor of each of the landlords.

Although Milwitt listed each of the tenants as appearing pro per on their court documents, the tenants believed that Milwitt was their attorney and taking care of their cases. Further, Milwitt listed a street address which actually corresponded to a general public mail services business where he rented a mailbox as the tenants' address on all documents he filed with the courts. Therefore, all correspondence relating to

the cases was forwarded to Milwitt rather than to the tenants, slowing their discovery of Milwitt's failure to represent them.

Milwitt filed bankruptcy petitions on behalf of several of the tenants, without their authorization or knowledge. These bankruptcy petitions listed the relevant landlords as well as fabricated creditors. While the tenants did not know about or authorize the filing of these petitions, Milwitt did tell them that for various reasons they did not have to pay judgments entered against them or move out after receiving eviction notices. The petitions were filed under Chapter 13 of the United States Bankruptcy Code, and the petitions indicated that the debtors would be filing a plan for repayment of the debts.

In 1999, Milwitt was indicted and convicted on charges of the unauthorized practice of law in California state court. Milwitt was released from state custody in February 2002. On March 21, 2002, Milwitt was indicted on six counts of bankruptcy fraud in violation of 18 U.S.C. § 157.[1] These charges were based on the bankruptcy petitions he filed on behalf of the tenants. In particular, the indictment states that between March 1997 and November 1998, Milwitt made "false and fraudulent representations, claims and promises concerning or in relation to a proceeding under [the Bankruptcy Code]" in relation to a scheme to defraud. The indictment describes the scheme in the following language:

> 2. Defendant Milwitt represented to persons threatened with eviction by their landlords that he would fight their eviction in court or negotiate an arrangement with their landlord.

---

[1]Milwitt was also charged with six other counts of bankruptcy fraud and four counts of social security fraud in violation of 42 U.S.C. § 408(a)(7)(B) related to petitions he filed in his own name. Those charges have been held in abeyance and are not relevant to this appeal.

3.  Based on his solicitations a number of persons retained the defendant's services to stop the eviction process. Defendant Milwitt normally charged fees for his services, as well as reimbursement for filing fees and other expenses.

4.  As a part of and in furtherance of his scheme, defendant Milwitt filed voluntary petitions with the United States Bankruptcy Court. . . . Under a provision of the United States Bankruptcy Code, the filing of a bankruptcy petition automatically suspends all judgments, collection activities, foreclosures, and repossessions of property, and prevents foreclosure on the property of a debtor until such time as the landlord or lender obtains relief from this stay or the bankruptcy is dismissed.

5.  In fact, the bankruptcy petitions were shams: the clients did not grant defendant Milwitt permission to file for bankruptcy on their behalf. Rather, with intent to deceive and for the purpose of filing the bankruptcies identified above, the defendant forged the names of the clients on documents filed without their knowledge or consent. As a further part of the scheme to defraud, he frequently supplied false social security numbers on the petitions.

6.  By filing the sham petitions, the defendant fraudulently interfered with the process of the United States Bankruptcy Court,[2] and fraudulently obstructed the creditors' legal right to collect back rents, and repossess the properties.

---

[2]Fraud on the Bankruptcy Court was not argued at trial, was not instructed and is not an issue on appeal.

7.   On or about the dates listed below, the defendant John Milwitt, having devised a scheme to defraud, for the purpose of executing and concealing the scheme and attempting to do so, concerning or in relation to a proceeding under Title 11 of the United States, did file bankruptcy petitions in the Northern District of California in the following debtors' names using false and fraudulent representations, each such act being a separate violation of 18 U.S.C. Section 157.[3]

At the end of a two day jury trial, Milwitt was convicted of five counts of bankruptcy fraud.[4] Milwitt timely filed a notice of appeal.

The evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Milwitt challenges the sufficiency of the evidence to sustain the bankruptcy fraud conviction, contending that the government proved that he acted with the intent to defraud the tenants rather than "the intent to defraud a creditor" of the tenants as charged in the indictment.

II

Although "[m]odern bankruptcy's origins are in English criminal law," in our country, "the criminal side of bankruptcy has assumed a more modest role." 1 Collier on Bankruptcy ¶ 7.01 (Alan N. Resnick & Henry J. Sommer, 15th ed. rev. 2006). Indeed, "every state legislature [has] enacted stat-

---

[3]The indictment goes on to name each of the six tenants on whose behalf Milwitt filed bankruptcy petitions as well as the case numbers and the dates those petitions were filed.

[4]The government dismissed one count of bankruptcy fraud before trial.

utory and constitutional provisions that limit[ ] or entirely prohibit[ ] imprisonment for debt." Becky A. Vogt, *State v. Allison: Imprisonment for Debt in South Dakota*, 46 S.D. L. Review 334, 335 (2001) (internal quotation and citation omitted). The bankruptcy act passed by Congress in 1841 was the first in world history allowing individuals to obtain voluntary discharge of their debts. Jason K. Kilborn, *Mercy, Rehabilitation, and Quid Pro Quo: A Radical Reassessment of Individual Bankruptcy*, 64 Ohio St. L.J. 855, 858-59 (2003).

**[1]** Although American bankruptcy law affords honest debtors civil remedies as a substitute for criminal punishment, Congress has always provided for the imposition of criminal penalties for those who abuse the bankruptcy system. The early enactments of Congress criminalized fraudulent and perjurious acts by debtors and creditors in connection with a bankruptcy. Craig Peyton Gaumer, *Bankruptcy Fraud: Crime and Punishment*, 43 S.D. L. Rev. 527, 532 (1998). With some modifications, these core bankruptcy criminal provisions have remained intact to this date, with the essential components codified into 18 U.S.C. § 152. *Id.* at 532-33.

**[2]** In 1994, as part of the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, Congress enacted a new bankruptcy crime statute. The centerpiece of the new criminal provisions, as codified in 18 U.S.C. § 157, was intended to "deter[ ] a person from using the bankruptcy process to further [ ] fraudulent schemes." Gaumer, 43 S.D. L. Review at 535. Section 157 was "consciously patterned on the federal mail fraud statute." 1 Collier on Bankruptcy ¶ 7.07[1][a].

**[3]** As opposed to the historic bankruptcy crimes, as exemplified in § 152, which concerns acts committed in the bankruptcy context, the focus of § 157 is a fraudulent scheme outside the bankruptcy which uses the bankruptcy as a means of executing or concealing the artifice. Specifically, § 157, the bankruptcy fraud statute under which Milwitt was charged, provides that:

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

> (1)   files a petition under title 11, including a fraudulent involuntary bankruptcy petition under section 303 of such title;
>
> (2)   files a document in a proceeding under title 11; or
>
> (3)   makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,

shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 157.

**[4]** In enacting § 157, Congress made it quite clear that the new crime was a specific intent crime. As Representative Brooks, who was Chair of the House Judiciary Committee and a sponsor of the legislation, stated in his official floor statement:

> An essential element of the new fraud action, as with other fraud actions, is requirement of proof beyond a reasonable doubt of a specific intent to defraud. Under no circumstance is this section to be operative if the defendant is adjudicated as having committed the act alleged to constitute fraud for a lawful purpose.

140 Cong. Rec. H10752 (daily ed., Oct. 4, 1994) (statement of Rep. Brooks).

**[5]** While we have not interpreted 18 U.S.C. § 157, we have discussed the elements of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, the mail and wire fraud statutes upon which § 157 was modeled, stating:

> [t]o allege a violation of the wire and mail fraud provisions, we have required only that the government show that there is 1) a scheme to defraud, 2) a use of the mails or wires in furtherance of the scheme, and 3) a specific intent to deceive or defraud.

*United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988).[5]

**[6]** The specific intent to deceive or defraud element of the mail and wire fraud crimes requires the prosecution to prove that the defendant intended to defraud an identifiable individual. In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute only reached

---

[5]Most of the few courts that have interpreted 18 U.S.C. § 157 have looked to 18 U.S.C. §§ 1341 and 1343 for guidance. *See, e.g.*, *United States v. Wagner*, 382 F.3d 598, 613 n.3 (6th Cir. 2004) (looking to analysis of the mail and wire fraud statutes in holding that actual reliance on the scheme to defraud is not an essential element of the crime); *United States v. Daniels*, 247 F.3d 598, 600 (5th Cir. 2001) (citing the constitutionality of the mail fraud statute in holding the bankruptcy fraud statute constitutional); *see also*, 1 Collier on Bankruptcy § 7.07[1][a], at 7-119 ("Section 157 is consciously patterned on the federal mail fraud statute. . . . The parallels between section 1341 and section 157 are close. . . . In other contexts . . . the Court has looked to decisions under the mail fraud statute when construing the new statutes. The same will follow for section 157."); *but see United States v. Lee*, 82 F. Supp. 2d 389, 392 (E.D. Pa. 2000) ("Similar though the language of the bankruptcy fraud statute is to that of the various other fraud statutes, we cannot, particularly as a matter of what appears to be first impression, import wholesale into the bankruptcy fraud statute the thick judicial gloss that has been applied over the years to these other statutes.").

the loss of money and property and not to "the intangible right of the citizenry to good government." *Id.* at 356 (overruled on this point by 18 U.S.C. § 1346). There, the indictment identified the scheme as devised "to defraud the citizens and government of Kentucky." *Id*. at 353. In reversing the mail fraud convictions, the Court noted that for the jury instruction to charge a crime under the mail fraud statute, it must show a loss of money or property from "the Commonwealth itself," the victim identified in the jury instructions. *Id*. at 360. Further, the government could not rely on evidence of the loss of property to another individual to support the conviction because that individual had not been identified in the jury instructions. *Id*. at 361.

We applied *McNally* in *United States v. Mitchell*, 867 F.2d 1232 (9th Cir. 1989), a case involving an alleged scheme to defraud a city and its citizens. In reversing the conviction, we held that "[a]lthough both indictments alleged a scheme to obtain money and property, neither alleged a scheme to obtain them from the governmental body." *Id*. at 1233. Similarly, in *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), we cited *McNally*, stating that "the Court made it clear that the intent must be to obtain money or property from the one who is deceived." *Id.* at 221.

**[7]** Given all of these considerations, we conclude that the crime of bankruptcy fraud under 18 U.S.C. § 157 requires a specific intent to defraud an identifiable victim or class of victims of the identified fraudulent scheme.

### III

Applying these legal principles to the case at hand, we conclude that the evidence tendered by the government is insufficient to support the verdict of bankruptcy fraud pursuant to 18 U.S.C. § 157. As we have noted, the government charged Milwitt with "fraudulently obstruct[ing] the creditors' legal right to collect back rents, and repossess the properties." In

sum, the fraudulent scheme was one to prevent the landlords from exercising legal rights, and the alleged victims were the landlords. The required bankruptcy nexus alleged was the filing of sham Chapter 13 bankruptcy petitions. There were no allegations in the indictment concerning a scheme to defraud the tenants, nor were the tenants identified as victims of the fraudulent scheme.

At trial, the government attempted to prove an entirely different case under an entirely different theory. The government's theory at trial was that the fraudulent scheme was to deprive the tenants of money, which the tenants gave Milwitt under the false pretenses that he was acting on their behalf to forestall eviction proceedings.

Throughout the trial, the government referred to the tenants, rather than the landlords, as the victims of Milwitt's fraudulent scheme. For example, in its opening statement, the government began by telling the story of some of the tenants who sought help from Milwitt. It went on to describe Milwitt's overall scheme and then stated that "[n]one of the victims authorized [Milwitt] to file bankruptcy on their behalf." Milwitt never filed bankruptcy on behalf of anybody but the tenants. Further, the government stated,

> [t]he evidence will show that the defendant intended to defraud the [tenants named in the bankruptcy petitions.] He did it by passing himself off as an attorney and by telling them he would be representing them and performing various legal services.

The government argued that the effect of the bankruptcy filing was that it allowed Milwitt to continue to represent to the tenants that he was taking care of their legal issues with their landlords. As the government stated,

> the defendant's supposed clients were aware that they were not being evicted despite having received

this notice to be evicted, and the defendant led them to believe that that was because he was working diligently on their behalf, he was defending them again [sic] these eviction proceedings. [The tenants] had no idea that a bankruptcy stay had anything to do with the delay—with the halt in the eviction proceedings.

The government went on to present evidence of fraud on the tenants throughout its case in chief, presenting nine witnesses—the six tenants, a former employee of the publisher of the phone book in which Milwitt advertised, an expert witness who testified about the effects of the bankruptcy filing and the unlawful detainer process, and the owner of the mail services business where Milwitt rented a mailbox. Each of the tenants testified about their living situations, the conditions that prompted them to contact Milwitt, and their experiences during the time they thought Milwitt was representing them. Each of the tenants testified that Milwitt informed them that they had a right to withhold rent. Further, after receiving notices of judgments against them, Milwitt provided various explanations for why they would not have to pay them or why they would not have to move out.

The phone book employee provided testimony about working with Milwitt on placing the yellow pages advertisements. In his dealings with the phone book company, Milwitt represented himself as "Joe Castle" and stated that he was either the advertising director or office manager for AP Assistance.

An expert provided testimony about both bankruptcy and landlord-tenant law, including testimony regarding the impact of a bankruptcy petition on the filer's creditors. Finally, the owner of the mail services business provided testimony about Milwitt renting a mailbox at her store and an incident in which she overheard him tell another customer that he could help because he was an attorney.

**[8]** None of the landlords testified nor was evidence introduced about any losses they experienced because of Milwitt's actions or how Milwitt's actions might have caused such losses. Rather, the only connection made between Milwitt's actions and loss to the landlords came through the tenants' testimony regarding the amount of rent withheld and the expert witness's testimony regarding the effect of bankruptcy petitions on outstanding judgments and pending actions. No evidence was presented concerning any scheme to defraud creditors, only debtors. There was no proof that Milwitt received or sought any money or other consideration from the landlords, only that he defrauded the tenants.

The proof, in fact, tended to show that the landlords were "slum lords" with a despicable record of repair and maintenance. Indeed, the government presented evidence that the tenants likely had valid claims against the landlords, justifying the withholding of rent.

**[9]** Not only did the evidence fail to show that the landlords were being wrongfully denied money and access to legal recourse, but the actual bankruptcy petitions did not seek to discharge the debt owed to the landlords. Rather, the petitions were filed pursuant to Chapter 13, which does not contemplate outright discharge of debts after liquidation of non-exempt assets, but instead involves adjustment of debts of an individual with regular income through a court-approved plan of payment.

**[10]** In sum, when the government rested its case, it had presented no proof that there was a scheme to defraud the landlords, much less that the bankruptcy petitions had been filed as a means of executing or concealing the scheme. Rather, the evidence showed that the tenants were likely justified in not paying the landlords; that the fraudulent scheme was one by Milwitt to deprive the tenants of money by fraudulently representing to them that he was representing their

interests against the landlord; and that the purpose of the bankruptcy filing was to conceal the fraud from the tenants.

After the government rested, the court presented counsel with the jury instructions it intended to give. The instruction at issue described the third element of bankruptcy fraud as requiring the jury to find that "the defendant acted with the intent to defraud a creditor of any person named in the corresponding bankruptcy petition." The government asked the court to reconsider the instruction, contending that it construed the indictment too narrowly by requiring proof that Milwitt intended to defraud a creditor rather than a tenant based on the general scheme described by the indictment, including the fraud on the tenants. The court refused to change the instruction based on paragraph six of the indictment, which states:

> By filing the sham petitions, the defendant fraudulently interfered with the processes of the United States Bankruptcy Court, and fraudulently obstructed the creditors' legal right to collect back rents, and repossess the properties.

After learning of the court's intended instruction, the government focused its closing argument on demonstrating that the landlords were the indirect victims of the overall scheme to defraud, while the tenants were the "primary mechanisms of the fraud." Essentially, the government argued that Milwitt "directly deceiv[ed] the clients and indirectly deceiv[ed] the landlords." Therefore, as the government itself stated in its closing argument, it had to prove that "[Milwitt] had the intent . . . for the fraud scheme to result in money in his pockets from [the landlords]." However, the government acknowledged, the scheme "was about paying money for himself. . . . He extracted filing fees for phony lawsuits, lawsuits that he claimed he was filing. . . . And also it was to get . . . fees for being a lawyer, which he wasn't." All of these filing fees and attorneys fees were payed directly from the tenants to Milwitt.

Further, the government recognized that "[t]he bankruptcy petitions were used to . . . cover the fact that the defendant was actually not a lawyer and he therefore could not actually file legal papers as he claimed he could and claimed he was doing. Instead, he was secretly filing bankruptcy petitions that anybody could file."

**[11]** The government argues on appeal that the evidence demonstrates that Milwitt knew that he would be depriving the landlords, at least temporarily, of their judgments against the tenants and possession of their properties by filing the bankruptcy petitions. However, the evidence demonstrates that Milwitt's intent was to prevent the tenants from discovering his fraud by filing the bankruptcy petitions. That he might have known that the filing would stay the landlords' claims is not enough to demonstrate specific intent. *See Bloch v. United States*, 221 F.2d 786, 788 (9th Cir. 1955) (reversing a tax fraud conviction where the judge instructed that "[t]he presumption is that a person intends the natural consequences of his acts, and the natural inference would be if a person consciously, knowingly and intentionally did not set up his income, and thereby the government was cheated or defrauded of taxes, that he intended to defeat the tax."). Further, the use of a Chapter 13 bankruptcy filing in order to adjust debts is perfectly proper. The Bankruptcy Code specifically addresses lessor-lessee relations. *See, e.g.,* 11 U.S.C. § 363. Had the tenants consulted with a legitimate attorney, that attorney might well have recommended a legal course that involved a Chapter 13 bankruptcy filing, especially if an attorney had been consulted after Milwitt had allowed the default judgments to be entered against the tenants without their knowledge.

**[12]** Under the mail fraud statute, intent to defraud may be established by circumstantial evidence, *see, e.g.*, *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989), and there is no reason not to apply this principle to the crime of bankruptcy fraud. However, as we have noted, bankruptcy fraud is

a specific intent crime, and even the circumstantial evidence presented at trial was insufficient to prove that Milwitt had a specific intent to defraud the landlords rather than the tenants. There was no proof offered at trial that Milwitt devised a scheme to defraud creditors of money and filed petitions in bankruptcy with specific intent to execute or further the scheme. Therefore, we conclude that the evidence presented at trial is insufficient to establish the crime.[6]

IV

**[13]** The government also argues for the first time on appeal that Milwitt committed a crime simply by filing bankruptcy petitions when there was evidence that at least some of the the debtors had sufficient assets to pay off their debts. We must forcefully reject this argument. First, until the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005) ("the 2005 Act"), which does not apply to this case, there was no statutory means testing at all in bankruptcy.[7] Second, this

[6]Contrary to the government's assertions, *United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001), does not compel a contrary result. Crawford was charged with wire fraud based on her use of interstate faxes to sell through an art dealer a valuable painting that she took from her office at UCLA. On appeal, she alleged insufficiency of evidence because ownership of the painting had not been established and, therefore, there was no identifiable victim. *Id.* at 1092. However, in *Crawford*, the fraudulent scheme was identified and proven, and the government established that Crawford knew that she had no ownership interest. *Crawford* is in stark contrast with the instant case, in which the indictment was based on an entirely different fraudulent scheme and victims. The dissent essentially urges an expansion of *Crawford* to include evidence of fraudulent schemes other than the one upon which the prosecution was based. This expansive interpretation would conflict with *McNally*. The dissent also contends that other circuits have reached a different conclusion. However, each of the cited cases involves a situation akin to *Crawford* in which there were identical schemes to defraud, but different named victims. This case involves a reliance on a different fraudulent scheme.

[7]The petitions in the case predate the effective date of the 2005 Act. *See id.* § 102. Under the 2005 Act, bankruptcy petitioners with relatively high

notion is a serious misapprehension of the nature of a filing of a voluntary petition in bankruptcy under Chapter 13 of the Bankruptcy Code. The entire idea of a Chapter 13 filing is to allow an individual debtor with a regular income to adjust his or her debts through a plan of repayment approved by the bankruptcy court. The requirements for Chapter 13 relief "bar[s] debtors from Chapter 13 eligibility if they are *unable* to make plan payments . . . ." 2 Collier ¶ 109.06[1] (emphasis added). In short, at the time the petitions at issued were filed, not only was it not a crime for a debtor to file a petition under Chapter 13 when the debtor had sufficient means to make payments; it was a *requirement* of Chapter 13 relief that the debtor have sufficient means to do so.[8]

Third, bankruptcy fraud under § 157 cannot be predicated only on acts that occur within the bankruptcy context that are untethered to the underlying fraudulent scheme. Other provisions of the bankruptcy criminal statutes address those acts, including § 152. However, bankruptcy fraud under § 157 must be related to the alleged fraudulent scheme. As Representative Brooks put it in his floor statement:

---

incomes may be prevented from filing under Chapter 7 and instead given the choice of converting to Chapter 13 (where some debt must be repaid out of future income) or having their petitions dismissed and receiving no bankruptcy relief. The presumption prior to passage of the 2005 Act was that the debtor was entitled to relief under Chapter 7 except upon a showing of substantial abuse. There is a new means test in the 2005 Act for individuals seeking Chapter 7 relief. However, even under the 2005 Act, the means test does not affect eligibility for filing for relief under Chapter 13, the chapter under which the petitions in this case were filed; the new means test only affects the requirements for Chapter 13 plan confirmation. *Id.*

[8]This is not to say, or imply, that there are no consequences for bankruptcy abuse, which may be subject to sanction under a variety of theories. Obviously, misrepresentations in a bankruptcy can lead to serious consequences, including potential bankruptcy crime charges under 18 U.S.C. § 152. However, the government does not allege that any affirmative misrepresentations were made in the Chapter 13 bare petition filings; rather, the government argues that the act of filing a Chapter 13 petition itself when the debtor has sufficient assets is a criminal act under § 157.

> It would also not be a crime under this section for a person to make a false statement or promise concerning a proceeding under title 11, as long as the false statement or promise was not made as part of a scheme to defraud involving the bankruptcy proceeding. Similarly, a person who conveys incorrect information about the pendency of a bankruptcy or the planned filing of a bankruptcy case would not be within the scope of this section unless that information was conveyed fraudulently and to further a fraudulent scheme.

140 Cong. Rec. H 10771 (daily ed. Oct. 4, 1994).

Finally, which perhaps goes without saying, the government did not charge the offense upon which it now relies.

[14] In short, the government's new contention that Milwitt could be liable for criminal bankruptcy fraud under § 157 for merely filing a voluntary petition under Chapter 13 when the debtor has sufficient means to repay the debts is not viable.

V

[15] Because the evidence presented was insufficient to sustain the verdict, we reverse the conviction and need not reach any other issue urged by the parties.[9]

**REVERSED.**

---

[9]The dissent contends that the dispositive issues were not argued by the parties. We respectfully disagree. One of the central arguments presented by Milwitt was that the government's evidence of fraud against the landlords, rather than the tenants, was insufficient to sustain the verdict. The government was well prepared to address—and did address—the precise questions at issue.

WALLACE, Senior Circuit Judge, dissenting:

Although the government's case was less than overwhelming, the evidence was sufficient for a reasonable jury to find that Milwitt possessed the requisite fraudulent intent beyond a reasonable doubt. This is all that is required to sustain a conviction against a sufficiency of the evidence challenge.

Additionally, the majority unnecessarily reaches the issue of whether intent to defraud an identifiable victim is required, which neither party raised. It resolves the issue in a manner directly contradicted by our precedents.

I therefore respectfully dissent.

## I.

As outlined by the majority, the evidence that Milwitt committed fraud is overwhelming. In order to appear effective, Milwitt filed fraudulent bankruptcy petitions on behalf of his clients without their consent, forged their signatures, and gave false accounts of their financial status. Many of these petitions misspelled the tenants' names or gave inaccurate social security numbers. A government expert testified that these inaccuracies would make it more difficult for creditors to assert their rights.

Milwitt filed the bankruptcy petitions in order to have the bankruptcy court enter "automatic stays" against the petitioners' creditors, here the landlords. These stays forced the landlords to halt any legal proceedings against the tenants, including eviction proceedings and the default judgments caused by Milwitt.

In several of the fraudulent bankruptcy petitions, Milwitt specifically listed the applicable landlords by name as creditors, subjecting them to the automatic stay. In at least one

instance, Milwitt also served a landlord-creditor with a "Notice of Bankruptcy Stay."

Milwitt also told at least one of the tenants, Janice Daniels, that she could pay Milwitt's fees in lieu of paying her rent. Daniels further testified that Milwitt told her that she could withhold rent payments and that all of the legal fees that she paid to Milwitt came out of rent money she would have otherwise paid her landlord.

After the jury convicted Milwitt on all five counts of bankruptcy fraud, Milwitt moved for a judgment of acquittal, which the district court denied.

We review the district court's denial of a motion for judgment of acquittal based on insufficient evidence de novo. *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002). Our review of the underlying jury verdict is much more deferential, however. We must defer to a jury's guilty verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "standard of review is a highly deferential one." *United States v. Henson*, 123 F.3d 1226, 1236 (9th Cir. 1997) (internal quotations omitted); *accord United States v. Nyemaster*, 116 F.3d 827, 828 (9th Cir. 1997) ("A challenge to the sufficiency of the evidence is reviewed under a highly deferential standard") (internal quotations omitted).

Importantly, "this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (internal quotations omitted). Instead, "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.

We have long recognized that "[i]t is often difficult to prove fraudulent intent by direct evidence and it must be inferred in such cases from a pattern of conduct or a series of acts . . . ." *United States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir. 1992) (internal quotations omitted). Therefore, "[i]t is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003); *see also United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) ("Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances") (internal quotations and alterations omitted).

## II.

The majority's holding that "18 U.S.C. § 157 requires a specific intent to defraud an identifiable victim or class of victims of the identified fraudulent scheme," maj. op. at 1276, will come as somewhat of a surprise to the parties, as neither side has raised the issue. "Courts generally do not decide issues not raised by the parties. If they granted relief to petitioners on grounds not urged by petitioners, respondents would be deprived of a fair opportunity to respond, and the courts would be deprived of the benefit of briefing . . . ." *Galvan v. Alaska Dep't of Corr.*, 397 F.3d 1198, 1204 (9th Cir. 2005) (footnote omitted). That is true here. The majority has provided no reason for its deviation from the normal rules of our adversarial system.

In this case, the government has only argued that it did in fact show that Milwitt intended to defraud the landlords. I would require the government to prove intent to defraud the landlords to the jury. I do not view the government's statement as an invitation to address an issue not briefed by either party.

Because the majority insists on deciding this "argument," I will address the merits of the majority's holding. I agree

with the majority that there is a substantial similarity between wire fraud and bankruptcy fraud; I would apply *United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001), and hold that an identifiable victim is not an element of bankruptcy fraud. *Crawford* squarely rejected the requirement that the government prove intent to defraud a specific victim or class of victims as an element of wire fraud. *See id.* at 1092-93. The majority in *Crawford* also specifically rejected the argument that *McNally v. United States*, 483 U.S. 350 (1987), and *United States v. Mitchell*, 867 F.2d 1232 (9th Cir. 1989), the only two supporting cases cited by the majority here, require proof of an identifiable victim. *See Crawford*, 239 F.3d at 1093 n.6. In short, we decided this issue five years ago.

In one brief footnote, the majority attempts to distinguish *Crawford*. Neither of its two rationales is valid. First, the majority argues that "in *Crawford*, the fraudulent scheme was identified and proven, and the government established that Crawford knew that she had no ownership interest." Maj. op. at 1282 n.6. But the same is true here. The evidence that Milwitt was engaged in a *fraudulent scheme* is nothing short of overwhelming. Milwitt was fraudulently representing himself as a lawyer and fraudulently filing bankruptcy petitions on his "clients'" behalf without authorization, using phony information. Milwitt was also fraudulently representing his activities to his clients. The *only question in this appeal* is whether the government actually proved the intent to defraud the landlords *as well as the tenants*. That Milwitt was engaged in a fraudulent scheme, which has been "identified and proven," cannot be debated seriously. The majority's attempt to distinguish *Crawford* on the basis that the existence of a fraudulent scheme has not been proven is therefore perplexing.

The majority also attempts to distinguish *Crawford* on the basis that Milwitt's "indictment was based on an entirely different fraudulent scheme and victims." Maj. op. at 1282 n.6. The majority does not explain what the material differences

are — except for the implausible contention that the existence of a fraudulent scheme has not been proved in this appeal. It is impossible to discern from its opinion a rationale for the distinction drawn by the majority.

What then has the majority accomplished? The majority has effectively adopted the legal position advanced by the *dissenting opinion* in *Crawford*. That dissent begins by stating its disagreement with the majority: "I dissent because the majority reads an essential element out of the crime of wire fraud and because the evidence is insufficient to prove that essential element. *Up to now, it has been the law that this crime requires an identifiable victim* . . . ." 239 F.3d at 1094 (Tashima, J., dissenting) (emphasis added).

Similarly, while the dissent tried to use *McNally* and *Mitchell* in an *identical manner* as the majority does here, *see* 239 F.3d at 1094 (Tashima, J., dissenting), the majority in *Crawford explicitly rejected* the argument that *McNally* and *Mitchell* require an identifiable victim. *See* 239 F.3d at 1093 n.6. After specifically distinguishing *McNally* and *Mitchell*, the majority in *Crawford* stated that "we have never held [an identifiable victim] to be an element of the offense of mail fraud." *Id.* The majority's attempt to resurrect an argument that we have already unambiguously rejected is startling. As a three-judge panel, we lack the authority to change a dissent into controlling law. *See United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005) ("a three-judge panel may not overrule [circuit precedents] absent intervening Supreme Court or en banc authority").

Additionally, it appears that the majority opinion in *Crawford* is in accord with *every other circuit* to decide this issue. See *United States v. Munoz*, 430 F.3d 1357, 1369 (11th Cir. 2005) ("The crime of mail fraud does not include an element requiring a contemplated harm to a specific identifiable victim") (internal quotations omitted); *United States v. Henningsen*, 387 F.3d 585, 590 (7th Cir. 2004) (same); *United States*

*v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997)) ("Indictments which do not identify specific mail fraud victims by name are sufficient") (internal quotations and alterations omitted). The majority's holding therefore simultaneously creates unjustifiable intra-circuit and inter-circuit conflicts.

I therefore dissent from the majority's unnecessary, unwise, and unsupported conclusion that bankruptcy fraud requires an identifiable victim or class of victims.

## III.

This appeal therefore should turn on whether a reasonable jury could have found that Milwitt possessed an intent to defraud the landlords. We have previously defined the requisite "intent to defraud" as "to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989). A reasonable jury could easily have concluded that Milwitt acted with "specific intent to deceive or cheat" the landlords (as well as the tenants) in order to benefit himself financially.

The success of Milwitt's scheme to collect legal fees was dependent in large measure on the landlords being successfully defrauded of rent money and forestalled from asserting their rights against the tenants. A reasonable jury could have readily concluded that if the landlords had not been fraudulently prevented from evicting the tenants and collecting on the default judgments caused by Milwitt, the tenants would have discovered that Milwitt was defrauding them. When the tenants discovered that Milwitt was defrauding them, they stopped paying his "legal fees," as Milwitt undoubtedly feared. The collection of his legal fees was thus based on Milwitt's ability to appear productive in the tenants' disputes with the landlords, which in turn was based on his ability to defraud the landlords successfully.

Milwitt specifically listed the landlords on several of the fraudulent bankruptcy petitions, which caused the landlords to be subject to the automatic stay. Milwitt even served one of them with a "Notice of Bankruptcy Stay." Milwitt was undoubtedly aware that the effect of the bankruptcy petition was to cause the automatic stay, and a reasonable jury was entitled to infer as much. Because the successful halting of the landlord's eviction proceedings was *essential* to Milwitt's ability to collect legal fees, a reasonable jury could also have concluded that Milwitt possessed the intent to defraud the landlords, as well as the tenants. This alone is sufficient evidence to support the jury's verdict.

The government also produced testimony that established that misspelling the tenants' names, as well as giving false social security numbers, would make it more difficult for the landlord-creditors to invalidate the fraudulently-obtained stays. The government further produced evidence that Milwitt was familiar with bankruptcy law and likely knew of this effect. This evidence therefore further supports the jury's verdict.

The jury's verdict is also supported by the testimony of Janice Daniels, who testified that Milwitt told her to pay Milwitt's legal fees instead of paying rent to her landlord. A reasonable jury could have concluded that Milwitt intended to defraud the landlords by having his "legal fees" paid at their expense, which is *precisely what occurred*. Viewing the evidence in the light most favorable to the government, this testimony reveals clear intent to defraud the landlords and obtain financial gain at their expense.

I must therefore respectfully, but forcefully, disagree with the majority's contention that "[n]o evidence was presented concerning any scheme to defraud creditors, only debtors." Maj. op. at 1279. Absent from the majority opinion is any demonstration of how the above evidence does not support the government's argument that Milwitt intended to defraud

the landlords. While the majority argues that "[t]here was no proof that Milwitt received or sought any money or other consideration from the landlords, only that he defrauded the tenants," maj. op. at 1279, a reasonable jury could have easily concluded Milwitt intended to receive money at the expense of the landlords — which is precisely what the jury did. Notably, *Cloud* only requires "intent to deceive or cheat for the purpose of either causing some financial loss to another, *or* bringing about some financial gain to oneself." 872 F.2d at 852 n.6 (emphasis added). Milwitt need not have "received or sought any money" directly from the landlords, as long as he intended to "bring[ ] about some financial gain to [him]self," *id.*, at their expense. I conclude that the second type of fraudulent intent under *Cloud* — which the majority ignores — is plainly supported by sufficient evidence.

Although the majority's opinion initially states the *Jackson* standard of review, its application strays from the Supreme Court's direction. The *only* relevant question is what a reasonable jury *could have found*, not how the majority would weigh the evidence from a cold record. For example, the majority argues that "[t]he proof, in fact, *tended to show* that the landlords were 'slum lords' with a despicable record of repair and maintenance." Maj. op. at 1279 (emphasis added). The relevant question is not what the evidence tends to show to our panel of judges, however. In relying on the premise that the landlords were not owed rent based on what the evidence "tended to show" two appellate judges, the majority fails to view the evidence in the "light most favorable to the prosecution." *Jackson*, 443 U.S. at 319.

The majority similarly states that "the evidence showed that the tenants *were likely justified* in not paying the landlords." Maj. op. at 1279 (emphasis added). The majority later argues that "[h]ad the tenants consulted with a legitimate attorney, that attorney *might well have recommended* a legal course that involved a Chapter 13 bankruptcy filing." Maj. op. at 1281 (emphasis added). Once again, the question is not what seems

likely to us, or what "might well have" happened, but whether *any* reasonable jury could have concluded fraud exists. The majority's use of "tended to show" and "were likely justified" and "might well have recommended" is indicative of the majority itself weighing the evidence and usurping the role of the jury. The majority's analysis thus gravely misconstrues the nature of our review under *Jackson*.

The majority also appears to believe that Milwitt could not simultaneously possess the intent to defraud the tenants and the landlords. It is true that the government erroneously pursued a wrong trial theory in focusing on fraud on the tenants. However, the evidence reveals that Milwitt possessed no shortage of fraudulent intent. The rulings of the district judge pulled the government back and directed it to the right track. The case went to the jury under proper instructions requiring proof beyond a reasonable doubt that Milwitt defrauded the landlords. Because a reasonable jury could have concluded that Milwitt's fraudulent intent was not solely directed toward the tenants, but also toward the landlords, Milwitt's conviction must be affirmed.

Unfortunately, the majority opinion does not analyze the evidence from which the jury could have found fraud on the landlords. Instead, it substitutes a conclusory discussion, which, as discussed above, is incorrect. A new trial is not in order as the Double Jeopardy Clause will bar any retrial of Milwitt. *See Smith v. Massachusetts*, 543 U.S. 462, 466-67 (2005) (collecting cases).

Because I believe that the evidence is sufficient to support the jury's verdict, I would not reach the government's argument regarding the ability of the debtors to pay off their debts.

## IV.

The majority seriously exceeds our authority under *Jackson* and as a three-judge panel. Simply put, we should not be

weighing evidence as if we were the jury. In addition, we are not an en banc court that has the power to change dissenting opinions into controlling law.

This undoubtedly would have been an easier case if the government had tried this case differently. Nonetheless, the government's poor tactical choice should not result in reversal. The majority does not discuss critical evidence supporting the government's case and fails to "view[ ] the evidence in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319. Under this "highly deferential" standard of review, I come out with the opposite result and would therefore affirm Milwitt's conviction.

I also must dissent from the majority's attempt to change the dissent in *Crawford* into the law of our circuit and its attempt to resurrect an argument based on *McNally* and *Mitchell* that *Crawford* explicitly rejected. Indeed, it is regrettable that the majority insisted on reaching an issue that neither party raised.