# United States Court of Appeals
## For the First Circuit

No. 16-1002

UNITED STATES,

Appellee,

v.

VALENTÍN VALDÉS-AYALA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Linda A. Backiel for appellant.
Mariana E. Bauzá-Almonte, Assistant United States Attorney,
Chief, Appellate Division, with whom Rosa Emilia Rodríguez-Vélez,
United States Attorney, and Mainon A. Schwartz, Assistant United
States Attorney, were on brief, for appellee.

August 15, 2018

**THOMPSON**, **Circuit Judge**.  For at least eight years Defendant Valentín Valdés-Ayala (Valdés) exploited the desperation of individuals who were behind on their court-ordered child support payments.  He did so by illusorily promising professional legal assistance in exchange for approximately $1,575 and then filing incomplete petitions in bankruptcy court to secure a stay on the Commonwealth of Puerto Rico's collection efforts.  Eventually Valdés's scheme attracted the attention of federal law enforcement officials which led to his trial and conviction on several fraud-related offenses.  On appeal he makes several claims of trial and sentencing error.  For the reasons discussed herein, we affirm his convictions and the order of restitution imposed, but vacate his sentence of incarceration and remand to the district court for resentencing.

## I. BACKGROUND

### A. Setting the Scene

To understand how Valdés exploited the bankruptcy and child support administration systems, it will help to understand the ways in which these systems have been designed to work.  We use the testimony the jury heard at trial to paint the backdrop against which Valdés operated his businesses.  The jury trial included testimony from a varied cast of 34 witnesses culminating

with Valdés, himself, taking the stand.[1]  So a heads up to the reader: There's a lot of factual detail to lay out before we can get to our discussion of Valdés's arguments on appeal.

## 1. Child Support Collection in Puerto Rico

In Puerto Rico, the Administracion para el Sustento de Menores ("ASUME") governs child support determinations, modifications, collections, and distributions.  When the Commonwealth's trial court orders a non-custodial parent to pay child support, ASUME is responsible for collecting the payment and sending it on to the custodial parent.  ASUME has several collection tools at its disposal when a non-custodial parent misses a scheduled payment, including retention of income tax refunds, withholding of income, suspension of sport or professional driver's licenses, and referrals to credit agencies.  One additional collection mechanism available to ASUME--the filing of a contempt motion in the Commonwealth trial court--can result in up to six months imprisonment for the delinquent parent.

For a parent in arrears wanting to put ASUME's collection efforts on hold (thereby freezing past-due obligations), filing a petition for Chapter 13 bankruptcy in the bankruptcy court does the trick, at least temporarily.  The reason: the filing generates

---

[1] Because Valdés challenges the sufficiency of the evidence to support some of his convictions, we will relay the facts of the case in the light most compatible with the jury's verdict.  See United States v. Serunjogi, 767 F.3d 132, 139 (1st Cir. 2014).

an immediate stay.  It also kicks out an automatic notification to ASUME, giving it the status of a creditor needing to file a proof of claim.  But notwithstanding the stay, the parent has a continuing obligation throughout the bankruptcy proceeding to pay the ongoing support obligations as they are due (i.e., payments that become due <u>after</u> filing the bankruptcy petition).  If the parent fails to meet the recurring payment deadlines, then ASUME can seek dismissal of the bankruptcy petitioner's case.  If dismissed, the entire child support arrears is immediately owed to ASUME.

### 2. Chapter 13 Bankruptcy

A Chapter 13 petition may be filed by individuals who have a regular source of income but need some breathing room to reorganize and repay their debts.  The bankruptcy process generates a plan for debt reorganization and repayment.  Two major benefits favor filing: (1) the automatic stay, or freeze, on every creditor's attempt to collect a debt owed by the debtor, and (2) a discharge, or forgiveness, of some types of debts at the end of the case, meaning the debtor never has to repay these debts.  But a child support debt is not one that can be forgiven (or, put in legal lingo, is "nondischargeable") and, in fact, has priority over the payment of other debts.  So the debtor's obligation to pay past-due child support never disappears.  For a non-custodial parent delinquent in child support payments, the automatic stay is

oft times the primary benefit of a Chapter 13 filing. And the power of this benefit is not to be underestimated; if the debtor is imprisoned for contempt for failure to pay court-ordered child support, the stay generates a get-out-of-jail-for-free order during the pendency of the proceeding. It also triggers a hands-off order of the debtor's earnings, thereby shielding it from creditor reach.

A Chapter 13 petition can be prepared and filed by an attorney, by a petition preparer,[2] or directly by the debtor, and it is supposed to include several documents. The three page petition itself covers general information about the debtor, an estimated number of creditors, an estimated sum of the debtor's assets and liabilities, the identity of the actual petition preparer, and whether the debtor has filed for bankruptcy within the last 8 years.[3] Moreover, a petition preparer (if any) must file a certification disclosing how much the debtor paid for the preparer's assistance.

---

[2] A bankruptcy petition preparer is "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation . . . a petition or any other document prepared for filing by a debtor in a United States bankruptcy court . . . ." 11 U.S.C. § 110(a).

[3] In addition, there are other separate forms, disclosures, and certifications which must be completed, depending upon the type of financial obligation involved.

Also required at Chapter 13 filing time is a debtor's certificate of course completion from a credit counseling service. 11 U.S.C. §§ 109(h), 521(b). A nonprofit called Credit Advisors Foundation ("CAF") administers such a course in Puerto Rico, even though it does not have a physical presence there. The course, which can be done online or by phone, mandates the debtor take an initial quiz, learn about budgeting and options for managing one's financial affairs, create a budget using the debtor's own financial situation, and complete a second set of quizzes. At the end of that process, a budget report and analysis as well as a certificate of course completion gets emailed to the debtor and the debtor's attorney (if one is listed in the debtor's account with CAF) for filing with the bankruptcy petition.

Attorneys can file Chapter 13 petitions and the accompanying documents electronically, but non-attorneys in Puerto Rico must file in person at the bankruptcy court located either in San Juan or Ponce. This includes pro se litigants, petition preparers, and friends or family members who file a document on the debtor's behalf. The clerk's office must accept a bankruptcy filing unless a court order is in place barring the individual from doing so.

While there are several documents that make up a complete Chapter 13 package, the automatic stay is nonetheless achieved by submitting a "skeleton filing," consisting of the petition, the

certificate of completion for the credit counseling course, and a few other certifications and declarations. Once docketed, the debtor has 14 days to turn in the remaining required documents and schedules. If all of the other paperwork is not filed within that time period, the bankruptcy trustee can move to dismiss the petition. The debtor may request additional time to submit the documents, but if the case reaches 45 days old and all of the required documents are not filed, then the case is automatically dismissed. Once dismissed, the protective stay thwarting all creditors' collection efforts goes away.

As for petition preparers assisting a debtor, there are strict rules about what the helper may and may not do. 11 U.S.C. § 110. The big no-no's: (1) Based only upon information provided by the debtor can the assister fill in the blanks on the petition; (2) no recommendation is to be given about the propriety of filing for bankruptcy or about which code chapter should be utilized, or about what the consequences of a bankruptcy filing might be; and, unsurprisingly, (3) the preparer cannot take the required credit counseling course on the debtor's behalf. The really big yes-yes: the petition preparer must sign several parts of the petition, attesting that he or she has adhered to the various and

comprehensive statutory parameters for acting as a bankruptcy petition preparer.[4]

After the petition is filed, the bankruptcy court sends a summons to the debtor with a time and date for a so-called "341 meeting."  Mandated by 11 U.S.C. § 341, the debtor is required to attend this meeting to discuss the petition.  Also in attendance is the bankruptcy trustee assigned to the case, as well as any creditors who wish to show.

Getting at holistic system concerns, bankruptcy analysts employed by the U.S. Trustee's office supervise all case filings in an effort to ferret out fraud in the system.  The job entails combing through bankruptcy filings, homing in on any red flags suggesting a case should not move forward with regular case processing.  In petitions prepared and/or filed by Valdés, giant red flags fluttered high.

### 3. Enter Valdés

Valdés, as we glean from his testimony, is a self-described musician, comedian, script writer, and salesman who has, at one time or another, studied conflict mediation, criminology, and chaplaincy, and, most relevant here, has had personal

---

[4] The curious reader is encouraged to check out In re Briones-Coroy, 481 B.R. 685, 692-95 (Bankr. D. Colo. 2012), for a history and unintended consequences of 11 U.S.C. § 110, the statute regulating the practice of non-attorney bankruptcy petition preparers.

experience with Puerto Rico's child support collection system, incarceration institutions, and the bankruptcy court system. In 2006, he started the Fundacion Lucha Pro Padres Convictos Por Pension ("the nonprofit") for the purpose "of defending the principles and dignity of every father convicted for failure to pay child support and release, defend, paternal feelings and relations and promote the right to freedom of every convict." In 2009, he was incarcerated for failing to pay his own court-ordered child support but was released after filing a pro se petition for bankruptcy. Three years later he founded a for-profit corporation called Tears in Prison, Inc. for the purpose of preparing bankruptcy petitions.

According to Valdés, around 20 people per month hired him to help them either get out of jail or avoid going to jail at all by preparing bankruptcy petitions in exchange for around $1,575 per petition. He admitted knowing that a bankruptcy petition preparer was not allowed to charge more than $500, so he knew not to list his true fee on the petitions. When he received the $1,575 payment, he says he referred the case to one of seventeen attorneys[5] throughout Puerto Rico who he told clients would prepare the

_____

[5] Valdés doesn't give us any information about these attorneys and other witnesses at trial only identified two of these attorneys by name.

petition.[6]  To facilitate his bankruptcy petition preparation when dealing with the imprisoned, Valdés obtained his clients' personal information from family members, then brought hard copies of the relevant documents to the jailhouse to get the incarcerated clients' necessary signatures.

According to Valdés, after getting those signatures, he would go to the closest Office Max store and tap into an email account he had set up, which tied his nonprofit, the Fundacion Lucha Pro Padres Convictos Por Pension, with CAF.  The purpose of the email hook-up was to pay for credit counseling courses for clients and to receive each client's certificate of completion for each course.  After printing out the certificate, Valdés would proceed directly to the courthouse to file the petition.[7]  His lofty "mission," he testified, was to get non-custodial fathers out of jail.  No one could stop him; he "ha[d] an order -- my ministry comes from another force.  It is a ministry sent to me based on what I suffered through, I have the gift of God to be the chosen one."

_____

[6] Psychological and job placement assistance were also on his nonprofit's service menu, but no one ever asked for psychological intervention.

[7] While the credit counseling material was available in English and Spanish, the bankruptcy petition paperwork was only available in English and it "wasn't his job" to translate it for his clients (who, as we'll recount in a moment, mostly spoke and read only Spanish).

- 10 -

Twelve of Valdés's clients testified at trial about their experiences with him; eight of whom also had a family member tell of their respective contact with him to coordinate the services he'd advertised on television (yes, he advertised). All of these clients had been behind on their court-ordered child support payments and most were in jail at the time they reached out to Valdés. This evidence revealed a common M.O.; we highlight three of his clients' experiences as representative of all twelve clients who testified.

Ever Colon Figueroa ("Colon"), imprisoned for the first time for failing to meet his child support obligations, became a Valdés client after hearing about the nonprofit from another inmate. Colon passed along the prison chatter to family members and they looked Valdés up. Colon's mother contacted and met with Valdés on behalf of her son and, based upon his promise to spring her son from prison, coughed up $1,775 for his services. After the meeting, Colon says he had a 20-minute visit with a female lawyer who was there, she said, on Valdés's behalf and he signed some papers "related to a bankruptcy," but did not take a credit counseling course. He was released from jail the next day, and went to the bankruptcy court on the day assigned on his summons. The attorney Valdés had promised to send was a no-show, so Colon was reincarcerated. Turning again to Valdés for help, Colon's mother paid Valdés yet more money, $1,200, to spring her son from

lock-up.  After getting paid, Valdés made a visit to the jailhouse where he huddled with Colon and two other inmates[8] for about a half an hour.  Colon signed more bankruptcy paperwork and completed a quiz by selecting answers to the multiple choice questions which Valdés told him to choose.  Valdés did not translate the papers for Colon, who did not speak or read English.  Upon Colon's second release Valdés promised to accompany him to his bankruptcy hearing, but Valdés never arrived.  During his testimony, when asked about the signature on the first bankruptcy petition Colon said it was not his.  Colon also pointed out that, on the second bankruptcy petition filed in his name, in the space where the petitioner is supposed to disclose all prior bankruptcy petitions filed in the previous eight years, the word "none" incorrectly appears.  Other than the two releases from jail, Colon received no other services from Valdés or the nonprofit.

Another client, Luis Serrano Aponte ("Serrano"), contacted Valdés by phone after he saw a TV commercial for the nonprofit, and the two arranged to meet at a Pizza Hut to discuss how Valdés could help keep him out of jail.  He understood from their conversation that Valdés was going to lower his child support payments by starting a Chapter 13 bankruptcy case and that a lawyer would help him with the case, though none ever did.  Serrano

_____

[8] The record is not clear whether these inmates were existing clients or potential clients.

testified that he did not speak or read English, and while he did sign some papers, he did not take a credit counseling course or any quizzes and he did not actually authorize Valdés to start a bankruptcy case for him. Serrano eventually learned that a bankruptcy case had been filed in his name when he received a letter from the court through the mail, but he testified that the signatures on the bankruptcy petition were not his. Even though Valdés was paid in full he would not answer Serrano's calls, and Serrano never spoke with him again.

A third client, Confesor Rohena Vila ("Rohena"), called Valdés after his girlfriend saw the nonprofit's TV ad (advertising works!). His experience followed the same, well-worn path as Valdés's other clients from the initial meeting to the two-time jailing and release. When Rohena's girlfriend reached Valdés on the phone following Rohena's second arrest, Valdés admitted he could have trouble with the court if he filed a third bankruptcy petition in Rohena's name and so told her there was nothing more he could do for them.

Eventually, the bankruptcy court noticed some common patterns with the petitions which listed Valdés as the non-attorney preparer. The Chapter 13s he filed were of the skeleton variety, with only one of the required schedules attached; the one for listing the debtor's "creditors holding unsecured property claims." Only the "domestic support obligation" category would be

checked off on this schedule, and only one creditor, ASUME, would be listed. No assets or other debt would be disclosed in these petitions.

Alejandro Oliveras Rivera, Assistant U.S. Trustee, who testified at Valdés's trial, presided over the 341 meetings for debtors whose petitions listed Valdés as the preparer. Some of these debtors were no-shows at their scheduled 341 meetings, while a few showed up with an attorney. Because none of the petitioners submitted all of the required documents within the allowed time, Oliveras often filed motions to dismiss. Eventually, Oliveras sought an injunction from the bankruptcy court to prohibit Valdés from acting as a petition preparer. Such an order preliminarily entered on September 14, 2012 and a second order entered December 5, 2012 after the bankruptcy court found that Valdés, despite the injunction, had continued to prepare and file bankruptcy petitions.

Prior to the permanent injunction hearing, the bankruptcy court compiled some data which reflected Valdés's filing activity. Between March 6, 2012 and July 16, 2012, Valdés prepared and filed 72 Chapter 13 petitions. By mid-September 2012, 61 of the 72 petitions had been dismissed; 8 more had pending motions to dismiss. 66 of the 72 did not have the required paperwork and debt reorganization plan filed, and, in 53 of the 72 cases, the debtor failed to appear at the 341 meeting.

- 14 -

On January 18, 2013, Valdés was permanently enjoined from acting as a bankruptcy petition preparer. Thereafter, bankruptcy counter staff refused to accept any petitions Valdés attempted to file. But Valdés wouldn't give up his heavenly mission--at least one staff member saw Valdés escort debtors or their family members to the counter to file a Chapter 13 petition. He also filed petitions through an assistant and he, himself, attempted to make filings at the bankruptcy court located in Ponce rather than San Juan. But as luck would have it, Valdés showed up in Ponce on a day when a San Juan staffer was working there and recognized him.

Also after issuance of the injunction, staff analysts continued to monitor Chapter 13 filings. According to their testimony, what they observed was an increase in the number of monthly pro se filings from 1 to 6-8.[9] They believed the injunction had not deterred Valdés.[10]

-----

[9] A bankruptcy court staff member also testified that the total number of pro se bankruptcy petitions filed per year increased after Valdés was enjoined. The data collected by the court reflected that 99 pro se bankruptcy petitions were filed in 2009; 102 in 2010; 111 in 2011; 226 in 2012; 194 in 2013; and 66 in 2014. While this data reflected the total number of pro se petitions filed and so may include a few genuine pro se petitioners, the staff member testified that pro se voluntary bankruptcy petition litigants were "not common," so he could infer that the increase was due to Valdés's activities.

[10] Post injunction, a Commonwealth family law judge instructed Valdés to appear before her after a father delinquent in his child support payments told her that Valdés had prepared and filed a bankruptcy petition on his behalf. Under oath at this hearing

- 15 -

## 4. Court Proceedings

In November 2013, a grand jury indicted Valdés on a variety of offenses, including bankruptcy fraud; wire fraud; aggravated identity theft; destruction, alteration, or falsification of records in federal investigations and bankruptcy; and contempt of court.[11] A jury trial ensued in April 2015. At the end of the government's case in chief, Valdés, through counsel, moved for judgment of acquittal (making very broad arguments) and moved again (in the same summary fashion) at the conclusion of all of the evidence. The district court denied both motions. Following deliberations, the jury convicted Valdés on all counts.[12]

At his November 2015 sentencing hearing, the district court imposed a 134-month term of incarceration, a $402,077.22 money judgment, and a $513,200 restitution order payable to the District of Puerto Rico Clerk of Court. Although the details of

---

Valdés admitted he had prepared a bankruptcy petition on behalf of the incarcerated father despite the injunction in place against him, but had not signed the petition as the preparer because of the injunction.

[11] When Valdés was arrested, he proclaimed to the officer that he had been helping parents who hadn't paid their child support get out of jail for the past eight years. If Valdés spent half a century in prison and was released with only ten days to live, he would continue to help these parents and hoped to provide his services worldwide.

[12] Two counts in the indictment (one for bankruptcy fraud, one for wire fraud) were dropped before trial because this individual passed away before trial.

the sentencing process and hearing are important, we will hold off on engaging in a substantive discussion of what happened until they become relevant to our analysis.

## II. DISCUSSION

The scene now set, it's time to dive into the several claims of error Valdés raises on appeal.

- The trial evidence against him for bankruptcy fraud, wire fraud, and aggravated identity theft was insufficient.[13]

- The government effected a constructive amendment or prejudicial variance of the bankruptcy fraud indictment by the evidence it chose to present and by its arguments at the end of the trial.

- The jury instructions for bankruptcy fraud and aggravated identity theft were either wrong or deficient.

- His sentencing went wrong in two ways: (1) his guidelines sentencing range was calculated using the wrong version of the Guidelines Manual, and (2) the $513,200 restitution order was improperly imposed.

We will take each argument in turn.

---

[13] Valdés does not raise any challenges to his convictions for either destruction, alteration or falsification of records in bankruptcy or for contempt of court.

- 17 -

## A. Sufficiency of Evidence

### 1. Bankruptcy Fraud Convictions

After the government rested and again at the close of trial, Valdés argued--broadly and briefly--that there was insufficient evidence to convict him of bankruptcy fraud because his clients filed their bankruptcy petitions "according to law." Before us, he spins his insufficiency claim in a different direction. According to Valdés, in order to prove he devised a scheme to defraud either child support beneficiaries or ASUME, the government needed to present testimony from beneficiaries affected by the scheme and also needed to submit records to show loss or delay in payments to ASUME. Because his argument here differs from the extremely broad and brief argument he made before the district court, we would ordinarily find his arguments forfeited and proceed on plain error review. The government's brief, however, does not challenge the preservation of this sufficiency claim, and assumes we will proceed on de novo review. Thus, we give Valdés the benefit of the doubt and deploy the legal principles reserved for preserved evidentiary challenges, as his argument fails even on de novo review.

We view "all [the] evidence, credibility determinations, and reasonable inferences therefrom in the light most favorable to the verdict[] in order to determine whether the jury rationally could have found that the government established each element of

the charged offense beyond a reasonable doubt." Serunjogi, 767 F.3d at 139 (quoting United States v. Portalla, 496 F.3d 23, 26 (1st Cir. 2007)). Our review does not extend, however, to "weigh[ing] the evidence or mak[ing] credibility judgments; these tasks are solely within the jury's province." Id. (quoting United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000)).

As we stated above, Valdés's evidentiary sufficiency challenge to his 18 U.S.C. § 157 bankruptcy fraud convictions is focused on the absence of evidence presented at trial to prove he devised a scheme to defraud either ASUME or child support beneficiaries (as specified in his indictment). Valdés points out that the ASUME administrator's testimony showed that payments pursuant to a court order for child support were still due on a continuing basis despite an active bankruptcy case and that the amount past due to ASUME was nondischargeable. Therefore, he schemed to deprive no one of anything. Continuing on, Valdés says the evidence demonstrated that his actual intent was to get fathers out of jail so that they could find work and pay their child support obligations. Countering this assertion, the government responds that its stated trial objective was to prove that Valdés's fraudulent misuse of the bankruptcy system delayed ASUME's efforts to collect the child support arrears due recipients, and that "[i]t was enough to prove that the fraudulent bankruptcy petitions

intentionally undermined ASUME's ability to collect payments on behalf of child support beneficiaries."

Our Circuit has yet to interpret § 157 bankruptcy fraud, so we turn to our sister circuits, many of which have addressed sufficiency-of-the-evidence challenges to convictions under this statute. Codified as part of the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 157 provides up to five years in prison, a fine, or both, for those who:

> [H]aving devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so --
>
> (1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;
>
> (2) files a document in a proceeding under title 11; or
>
> (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title[.]

This type of bankruptcy fraud targets those who use the bankruptcy system as a way of executing or concealing a scheme originally devised outside of the bankruptcy context instead of targeting schemes executed within the bankruptcy system (which are covered by § 152). United States v. Milwitt, 475 F.3d 1150, 1155 (9th Cir. 2007).

Our sister circuits have generally broken out the elements required to prove bankruptcy fraud pursuant to this statute as follows: "(1) devising a scheme to defraud, and (2) filing a document in a bankruptcy proceeding or making [a] false or fraudulent statement in relation to the bankruptcy proceeding for the purpose of executing or concealing the fraudulent scheme." United States v. Free, 839 F.3d 308, 319 (3d Cir. 2016) (quoting United States v. Knight, 800 F.3d 491, 505 (8th Cir. 2015)) (alteration in original); see also United States v. Kurlemann, 736 F.3d 439, 452 (6th Cir. 2013); United States v. White, 737 F.3d 1121, 1131 (7th Cir. 2013). Some circuits add "specific intent to defraud" as a third element. See United States v. Spurlin, 664 F.3d 954, 964 (5th Cir. 2011); Milwitt, 475 F.3d at 1156. "[B]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself . . . ." United States v. Persfull, 660 F.3d 286, 294 (7th Cir. 2011) (quoting United States v. Howard, 619 F.3d 723, 727 (7th Cir. 2010)). We join our sister circuits in their approach finding the crime of bankruptcy fraud pursuant to § 157 has been committed when (1) a defendant has the specific intent to devise a scheme to defraud and (2) takes one of the actions enumerated in § 157(1)-(3) "for the purpose of executing or concealing such a scheme or artifice or attempt[s] to

do so." 18 U.S.C. § 157. Further, like the Sixth and Seventh Circuits, we conclude "the government need not prove that any creditors were actually defrauded in order to establish the elements of bankruptcy fraud . . . 'because the [f]iling itself is the forbidden act . . . [so] [s]uccess of the scheme is not an element of the crime.'" White, 737 F.3d at 1131-32 (quoting United States v. DeSantis, 237 F.3d 607, 613 (6th Cir. 2001)) (some alterations in original).

Valdés urges us to see the evidence admitted in his trial through the same lens as that worn by the Ninth Circuit in Milwitt when it first interpreted § 157. In that case, the defendant held himself out as an attorney who could help individuals defend against unlawful detainer actions filed by their landlords. 475 F.3d at 1152. He was not admitted to any bar to practice law, but several individuals hired him, believing he was an attorney. Id. He filed papers in court on their behalf without their knowledge and consent, including bankruptcy petitions, listing his clients as pro se, but using his own general post office box as the address on the filings. Id. at 1152-53. He advised his clients that they could withhold rent from their landlords, refuse to move out after receiving an eviction notice, and ignore any default judgments entered against them in court. Id. at 1152, 1153.

In a split decision, the Milwitt majority reversed, concluding there was insufficient evidence to support the

- 22 -

defendant's conviction for § 157 bankruptcy fraud. Id. at 1156-59. The majority found that the government's indictment specifically charged the defendant with intending to defraud the landlords, not the tenants. And because, during the trial, the government's evidence only proved that the defendant had intended to defraud the tenants who had retained Milwitt to defend them against the detainer actions, it was insufficient. Valdés attempts to analogize his case to Milwitt to emphasize a difference he perceives between the victims he contends are alleged in the charging indictment here and the victims he says were emphasized in the government's case at his trial. Valdés argues his case tracks Milwitt's because, as in Milwitt, the government didn't present any evidence about a scheme to defraud victims identified in the indictment, i.e., creditors (landlords/ASUME), rather it only put on evidence of non-identified debtors (tenants/Valdés's clients). See id. at 1158. We disagree with Valdés's assertion that he and Milwitt are in the exact same boat.

Here's what was brought out at trial. Valdés devised a strategy to charge, on average, $1,575 to individuals in exchange for either getting the individual out of jail or preventing the individual from being incarcerated for failure to pay court-ordered child support. Valdés established both a nonprofit and a for profit corporation as corporate fronts for advertising and executing his scheme. He promised his clients legal representation

at the bankruptcy court, but most clients testified that they never met with an attorney and often could not get in touch with Valdés again after he got hold of their money and filed the bankruptcy petitions. The evidence at trial also established that Valdés filed hundreds of skeleton petitions in execution of his scheme. The petitions in evidence show Valdés listed only $300 as his petition-preparing fee when other evidence showed his clients generally paid $1,575 for his services.

Moreover, the indictment (which we'll discuss in more detail in Section B) placed Valdés on notice that there were several categories of victims of his scheme and the government put on evidence demonstrating how he took advantage of them all. Between the government's witnesses and Valdés's own trial testimony admitting to the various components of his scheme, a rational jury could have concluded Valdés intended to defraud a variety of groups: (1) his clients, by taking money and not delivering all of the services promised; (2) ASUME, by filing skeletal bankruptcy petitions which listed ASUME as the only creditor for each debtor, knowing the petitions would trigger an automatic stay on ASUME's efforts to collect; (3) child support beneficiaries, by weakening ASUME's power to enforce court-ordered child support; and (4) the bankruptcy court, by taking advantage of this government resource to quickly fulfill the most important service Valdés promised: release from jail. A rational jury could

also conclude Valdés had the specific intent to defraud because he intended all of these actions as well as intended the results by filing the barest possible petition to get his clients out of jail using the automatic stay generated by filing a bankruptcy petition.

There is, therefore, ample evidence to support Valdés's convictions for bankruptcy fraud.

## 2. Wire Fraud Convictions

Valdés's challenge to the sufficiency of evidence to support his wire fraud convictions presents the same issue-preservation situation as with his challenge to his bankruptcy fraud convictions. Before the district court, Valdés argued broadly that the jury couldn't convict him of wire fraud, in part because his use of the internet to complete the credit counseling course was authorized by his individual clients. Before us, Valdés placed all of his chips on his bet that we would find insufficient evidence of bankruptcy fraud, and so only argues that without sufficient evidence to sustain his convictions for bankruptcy fraud, there is insufficient evidence to support his convictions for wire fraud.[14] Again, the government presumes de novo review,

_____

[14] Minimally, Valdés does say in his summary of arguments section of his brief that his "conviction must be vacated on the wire fraud counts for failure to prove the transmission was material to a fraud" but the argument does not get fleshed out at all in the argument section. It's well-settled that we waive arguments that are simply mentioned but not developed in any meaningful way. See Echevarría v. AstraZeneca Pharmaceutical LP,

and again we give Valdés the benefit of the doubt and proceed to evaluate the evidence from which a rational jury could conclude he was guilty of wire fraud.

We can be brief with this discussion. A conviction for wire fraud pursuant to 18 U.S.C. § 1343 is dependent on three elements: "[1] [A] 'scheme to defraud,' [2] the accused's 'knowing and willful participation in the scheme with the intent to defraud,' and [3] the use of interstate or foreign 'wire communications' to further that scheme." United States v. DiRosa, 761 F.3d 144, 150–51 (1st Cir. 2014) (quoting United States v. Denson, 689 F.3d 21, 24 (1st Cir. 2012)). The evidence supporting the existence of a scheme to defraud and Valdés's knowing participation in that scheme has been laid out above. The evidence also readily supports Valdés's use of interstate wire communications in furtherance of his scheme. Testimony from a representative of CAF revealed that Valdés's account included a hotmail email address to which his clients' certificates of completion for the required credit counseling course would be emailed.[15] The testimony revealed CAF has offices in Omaha, Nebraska and Scottsdale, Arizona, but not in Puerto Rico.

---

856 F.3d 119, 139 (1st Cir. 2017); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

[15] An email address has long counted as a wire communication. See United States v. Martin, 228 F.3d 1, 18-19 (1st Cir. 2000).

Moreover, none of the company's credit counselors are located in Puerto Rico. In addition, a custodian of records for Microsoft Corporation testified that none of the email services operated by Microsoft (including hotmail) have servers located in Puerto Rico. So, if someone in Puerto Rico sent an email to someone else in Puerto Rico, then the email would have to cross state lines during its transmission.

There is sufficient evidence from which a rational jury could conclude Valdés used interstate wire communications to further his scheme and therefore to support his convictions for wire fraud. Soldiering on, we next address Valdés's effort to vacate his convictions for aggravated identity theft on the basis that there was insufficient evidence to support his two counts of conviction for this crime.

### 3. Aggravated Identity Theft Convictions

With these convictions, we agree with the parties' assumption that Valdés's sufficiency-of-the-evidence challenge is properly preserved for our de novo review. Valdés's convictions are linked specifically to two of his clients we mentioned before: Serrano and Colon. Aggravated identity theft is committed when, "during and in relation to" the commission of one of several enumerated felonies (including wire fraud), one "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1),

- 27 -

(c)(5). A "means of identification" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including "name, social security number, date of birth," etc. § 1028(d)(7).

Valdés argues there was insufficient evidence to convict him of aggravated identity theft because Serrano and Colon gave him their personal information willingly to use for the agreed-upon purpose of filing a petition with the bankruptcy court. According to him, he didn't attempt to impersonate either Serrano or Colon when he used their personal information, and his use of their information as their agent was for their benefit. Valdés also claims the crime of identity theft is limited to situations in which another person's identity is used for the purpose of deceiving a third party. Because CAF knew Valdés was an intermediary for the individuals who were registered as customers of the credit counseling course, he asserts that he did nothing wrong.

For its part, the government argues that whether Valdés's clients willingly gave their personal information to him to use is irrelevant because his use of their information to obtain credit counseling certificates was unlawful. The government asserts our case law requires a defendant to purport to take action on another's behalf and that this requirement is satisfied here

because Valdés used his client's names and addresses in relation to the wire fraud crimes.

In United States v. Ozuna-Cabrera, we examined whether a means of identification obtained with the consent of the identification's subject could still be used "without lawful authority" in violation of § 1028A. 663 F.3d 496, 498 (1st Cir. 2011) (defendant had purchased an expired passport and social security card from the owner and used it in his application for a new passport). We held that, regardless of the way in which the means of identification had been obtained--whether by theft or with permission--if the means of identification is subsequently used during the commission of one of several enumerated felonies and in a way that is against the law, then the use is "without lawful authority" and is in violation of § 1028A. Id. at 499, 501.

A few years later, we examined what it means to use the means of identification of another. United States v. Berroa, 856 F.3d 141, 155 (1st Cir. 2017). In that case, the defendants had obtained their medical licenses after falsifying exam result data and then wrote prescriptions for patients. Id. at 147, 155. We reversed their convictions for aggravated identity theft because their use of patients' names and addresses on prescriptions was not "use without lawful authority of the identification of another person." Id. at 155-56. We held that to "use" the identification

- 29 -

of another person means to "attempt to pass him or herself off as another person or purport to take some other action on another person's behalf." Id. at 156. The defendants had neither passed themselves off as their patients nor taken any actions on their patients' behalf.

Reading these two cases together then, "regardless of how the means of identification [are] actually obtained, if its subsequent use [i.e. 'attempt[ing] to pass him or herself off as another person or purport to take some other action on another person's behalf,' Berroa, 856 F.3d at 156] breaks the law . . . it is violative of § 1028A(a)(1)." Ozuna-Cabrera, 663 F.3d at 499 (emphasis added); see also United States v. Morel, 885 F.3d 17, 23 (1st Cir. 2018) (holding there was sufficient evidence from which jury could conclude one of the defendants had used the means of identification of another without lawful authority because government had proved that she deposited a check from the U.S. Treasury showing the name and forged endorsement signature of another person).

Valdés took several actions on behalf of Serrano and Colon. Serrano testified the signature on the main bankruptcy petition was his, but he had not understood at the time that Valdés would be starting a bankruptcy case for him.[16] Serrano also

---

[16] Recall Serrano also testified he does not read English.

testified the other six debtor signatures on the exhibits, declarations, and certifications attached to the petition were not his, and the signature on CAF's course paperwork was not his. In addition, Serrano did not recall taking a credit counseling course or completing any of the quizzes or other components of the course. Colon testified he does not read or speak English. He testified he did not take a credit counseling course either of the two times he was incarcerated for failure to pay child support, but that when he was in jail for the second time he had filled in answers to a quiz that was part of a stack of papers Valdés brought to him in jail, with Valdés telling him which answers to choose.

Viewing the evidence in the light most favorable to the verdict as we must, and drawing reasonable inferences therefrom, Serunjogi, 767 F.3d at 139, a rational jury could infer Valdés forged Serrano's signature on the various declarations, disclosures, and certifications that are required parts of the bankruptcy petition as well as on the credit counseling course paperwork. A rational jury could also infer Valdés completed all of the requirements of the credit counseling course on behalf of Colon for the first bankruptcy petition filed and simply instructed Colon how to answer each of the quiz questions on the second round of the bankruptcy petition preparation. A jury could therefore conclude Valdés used Serrano's and Colon's names and social security numbers to complete the credit counseling courses on their

behalf, a step that was integral to the perpetration of Valdés's scheme because completing the credit counseling course was a requirement for filing their bankruptcy petitions. Coupled with Valdés's affirmed convictions for wire fraud (one of the enumerated felonies in § 1028A(c)), we hold there is sufficient evidence to support Valdés's convictions for aggravated identity theft in violation of § 1028A(a)(1). See Berroa, 856 F.3d at 156; Ozuna-Cabrera, 663 F.3d at 501.

## B. Indictment

Valdés argues (for the first time in this appeal and echoing themes of his sufficiency challenge) that the bankruptcy fraud theory the government argued in its closing constituted a constructive amendment to his indictment because, at trial, the government emphasized Valdés's perpetration of a scheme to defraud his clients by promising legal services not rendered instead of a scheme to defraud child support beneficiaries and ASUME, as alleged in the indictment. Alternatively, Valdés argues that the shift in the government's focus represents a prejudicial variance because the government expanded its basis for conviction. He contends that all of this resulted in the nullification of his planned defense that his actions weren't intended to or capable of hurting

the child support recipients or ASUME and deprived him of the notice of charges to which he was entitled.

The government, for its part, argues that the prosecution offered sufficient evidence to prove that Valdés's scheme delayed ASUME's collection efforts (and the child support beneficiaries' ultimate receipt of the support), so there was neither a constructive amendment of the indictment nor a prejudicial variance and Valdés had sufficient notice of the bankruptcy fraud charge against him.

Valdés concedes our review of his arguments related to the indictment is for plain error. Plain error review "entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. George, 841 F.3d 55, 64 (1st Cir. 2016) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

One of the principles embodied in the Sixth Amendment is a "guarantee of the right of an accused 'to be informed of the nature and cause of the accusation . . . .'" United States v. Tomasetta, 429 F.2d 978, 979 (1st Cir. 1970). Our court views the indictment as a whole to determine whether a defendant has had adequate notice of the charges against him. Id. (advising that one of the considerations when determining the adequacy of a charge

in an indictment is "whether the indictment as a whole conveys sufficient information to properly identify the conduct relied upon by the grand jury in preferring [sic] the charge"). "Without sufficient information to identify th[e] conduct which the grand jury has deemed adequate to support an indictment, an accused is at a material disadvantage in meeting the charge against him." Id.

"[A] constructive amendment occurs when the charging terms of an indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. Taylor, 848 F.3d 476, 495 (1st Cir.), cert. denied, 137 S. Ct. 2255 (2017) (quoting United States v. McIvery, 806 F.3d 645, 652 (1st Cir. 2015)) (alteration in original). "The rule against constructive amendments exists 'to preserve the defendant's Fifth Amendment right to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him.'" Taylor, 848 F.3d at 495 (quoting United States v. Vizcarrondo-Casanova, 763 F.3d 89, 99 (1st Cir. 2014)). "As we have previously said, '[a] primary objective of the rule against constructive amendment of indictments is to ensure defendants have notice of the charges they must defend against.'" United States v.

Hernandez, 490 F.3d 81, 84 (1st Cir. 2007) (quoting United States v. Dubón-Otero, 292 F.3d 1, 5 (1st Cir. 2002)).

"A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008) (quoting United States v. Cianci, 378 F.3d 71, 94 (1st Cir. 2004)). However, "when a change le[aves] the substance of the charge unaffected, the switch d[oes] not usurp the prerogative of the grand jury." United States v. Godfrey, 787 F.3d 72, 79 (1st Cir. 2015) (quoting United States v. Dowdell, 595 F.3d 50, 67-68 (1st Cir. 2010)) (alterations in original). "A variance is grounds for reversal 'if it affected the defendant's substantial rights— i.e., the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.'" Godfrey, 787 F.3d at 79 (quoting United States v. Fisher, 3 F.3d 456, 463 (1st Cir. 1993)) (internal quotation marks omitted).

The bankruptcy-fraud-specific section of Valdés's indictment alleges Valdés intended to defraud ASUME and child support beneficiaries. The indictment's general allegations, however, which were all incorporated by reference in the bankruptcy-fraud-specific section of the indictment, clearly include an allegation that Valdés defrauded his clients using the bankruptcy court. There can be no doubt then that Valdés's

- 35 -

indictment placed him on notice that his charges were related to his bankruptcy court scheme.  See Hernandez, 490 F.3d at 84.  The indictment also clearly put Valdés on notice that the government was focused on a few different victims: ASUME, child support beneficiaries, his clients, and the bankruptcy court.  But importantly, as we have already said, to establish the elements of bankruptcy fraud, the government does not need to prove that any creditors were actually defrauded, just that Valdés committed the forbidden act in relation to the bankruptcy petition in execution of, or in furtherance of, his scheme.  See White, 737 F.3d at 1131-32; Free, 839 F.3d at 319; DeSantis, 237 F.3d at 613.

Consistent with the indictment allegations, there was a lot of testimony at trial from Valdés's clients.  But the government also presented testimony from the ASUME administrator that the bankruptcy petitions effectively froze all of their avenues for enforcing court-ordered child support and collecting the amounts past due.  The government's closing argument summarized all the testimony at trial, including the delay ASUME and child support beneficiaries experienced as a result of Valdés's scheme.  The evidence at trial did not, therefore, substantively alter the charges against Valdés in the indictment and it did not show a materially different sequence of events than that depicted in the indictment.  As a result, there is no hint of either a constructive

amendment or prejudicial variance here, never mind plain error. See Taylor, 848 F.3d at 495; Godfrey, 787 F.3d at 79. We move on.

## C. Jury Instructions

Also for the first time on appeal, Valdés accuses the trial judge of improperly instructing the jury about both bankruptcy fraud and aggravated identity theft. The government submitted proposed jury instructions; Valdés submitted none. With respect to bankruptcy fraud, the government adapted its proposed instruction from the Eighth Circuit's and Ninth Circuit's model jury instructions. The two Circuits use almost identical instructions defining three elements, but the Ninth Circuit adds a fourth element which requires the defendant's action to be material, (meaning the action "had a natural tendency to influence, or was capable of influencing the acts of an identifiable person, entity, or group" à la Milwitt, see 475 F.3d at 1156), whereas the Eighth Circuit only attaches materiality to one of the many forbidden-act options in the statute. Compare 9th Cir. Manual of Model Criminal Jury Instructions § 8.11 with 8th Cir. Model Jury Instructions § 6.18.157. As we'll discuss in a moment, the district court did not use the government's proposed instruction verbatim, and did not include materiality as an element. With respect to aggravated identity theft, the government proposed, and the district court used, our Circuit's pattern jury instruction for this offense. The district court added a definition for

"without lawful authority," in part quoting straight from Ozuna-Cabrera.

Valdés freely admits that trial counsel did not object to any part of the jury instructions at any point during trial, so he has forfeited any level of review before us other than for plain error.[17]  "When applying the plain error standard in the context of jury instructions, [this court] look[s] at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury."  United States v. Bauzó-Santiago, 867 F.3d 13, 23 (1st Cir. 2017) (quoting United

---

[17] Federal Rule of Civil Procedure 51 requires the court to give parties the opportunity to object to its proposed jury instructions before closing arguments and the instructions are delivered. Fed. R. Civ. P. 51(b)(2). For an objection to be timely (except in circumstances not relevant here), it must be made at this point. Fed. R. Civ. P. 51(c)(2)(A). Failure to do so means the objection is forfeited and reviewed for plain error only, the idea being that the trial judge should be afforded the opportunity to cure the alleged error and litigants stopped "from ensuring a new trial in the event of an adverse verdict by covertly relying on the error."

Rosa-Rivera v. Dorado Health, Inc., 787 F.3d 614, 618 (1st Cir. 2015) (quoting Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 41, 43 (1st Cir. 2010)).  As we have already said, "[r]eversal under the plain error standard requires: (1) that an error occurred; (2) that the error was obvious; (3) that it affected the defendant's substantial rights; and (4) that it threatens the fairness, integrity or public reputation of the proceedings." United States v. Rivera-Ruperto, 852 F.3d 1, 10-11 (1st Cir. 2017) (quoting United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014)).

States v. <u>Candelario-Santana</u>, 834 F.3d 8, 27 (1st Cir. 2016))
(alterations in original) (emphasis omitted).

### 1. Bankruptcy Fraud

During trial, the district judge instructed the jury that, in order to convict Valdés on the bankruptcy fraud charges, they had to find him guilty beyond a reasonable doubt on three elements:  he had "intentionally devised or intended to devise the scheme or plan to defraud described in the indictment," he "acted with intent to defraud," and he "filed a petition in a Title 11 bankruptcy proceeding for the purpose of executing or attempting to execute the scheme."  The district judge also provided definitions for "scheme," "defraud," and "intent to defraud." Nevertheless, according to Valdés, a few pages of the jury instructions were left out of the printed version that went into the deliberation room with the jurors.  Indeed, the version of the jury instructions filed on the docket reflects only one of the elements of bankruptcy fraud the trial judge recited in open court (the intent to devise the scheme or plan to defraud element).  The rest seem to be missing.  But Valdés doesn't show that the jury was definitely missing a page while they deliberated; all we know for sure is the docketed version of the instructions are missing the page or pages which accurately capture the complete bankruptcy fraud instruction.

Nonetheless, Valdés tries to make much of this clerical snafu and argues the jury would have felt compelled to decide he was guilty of each count of bankruptcy fraud based on the instructions purportedly sent into the deliberation room only showing one of the bankruptcy fraud elements. But the instructions given in open court recited all of the statutory elements for bankruptcy fraud and the verdict form had all of the same elements for each count of bankruptcy fraud. So the jury both heard all of the elements recited in open court and had all of the elements in front of them as they completed the verdict form. Valdés's argument is, therefore, a non-starter, especially because he doesn't even attempt to show us how this clerical error amounts to plain error.

Valdés also argues that the oral instructions were "deficient" because the district court did not provide a definition of "specific intent" as part of the bankruptcy fraud instruction and omitted materiality as an element. As the government points out, however, the district court did define the "intent to defraud" element ("means to act willfully and deliberately with the specific intent to deceive or cheat for the purposes of either causing some financial loss to another or bringing about some financial gain to one self") and this instruction clearly includes an explanation of specific intent as well. Valdés also tries one more time to get us to adopt the <u>Milwitt</u> approach we discussed earlier, asserting

- 40 -

error in the oral instruction for not instructing the jury that the specific intent required was to defraud an identifiable victim or class of victims of the identified fraudulent scheme. We have already explained why he is mistaken, so Valdés certainly hasn't shown us that the district court's omission of this element in the instruction for bankruptcy fraud was in error.

Valdés also finds fault in the district court's omission of materiality as an element in the charge for bankruptcy fraud, but he doesn't tell us why or develop any argument on this point. As a result, he hasn't shown us--as he must--how the omission of this element was a clear error. So this contention goes nowhere fast. In all, Valdés has not exposed any clear or obvious error in the instructions for bankruptcy fraud. As a whole, the jury instructions adequately explained the bankruptcy fraud charge without confusing or misleading the jury. See Bauzó-Santiago, 867 F.3d at 23.

We move on to the instructions for aggravated identity theft.

### 2. Aggravated Identity Theft

To find Valdés guilty of aggravated identity theft, the district judge instructed the jury they had to find the government had proven, beyond a reasonable doubt, that: (1) Valdés committed wire fraud; (2) Valdés knowingly possessed and used, without lawful authority, the names and social security numbers for clients

Serrano and Colon; (3) these names and social security numbers actually belonged to an individual other than Valdés; and (4) Valdés knew the names and social security numbers belonged to other people. The district judge also provided a definition of "without lawful authority":

> The term "without lawful authority" does not require that the means of identification be stolen or taken without the owner's permission. Instead, 18 U.S.C. § 1028A reasonably proscribes the transfer, possession, or use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law. In other words, regardless of how the means of identification is actually obtained, if its subsequent use breaks the law--specifically, during and in relation to the commission of the crime of wire fraud--it is violative of 18 U.S.C. § 1028A.

Valdés argues the jury was misinstructed on aggravated identity theft because the definition of "without lawful authority" was wrong. He seems to be arguing that because (in his view) he served as a bona fide agent for his clients, both obtaining and using their personal identifying information with their permission, he actually acted with lawful authority, but the district court's definition of "without lawful authority" prevented the jury from seeing things his way. We disagree. Valdés focuses too much on the way in which he obtained the information and ignores how he subsequently used it.

Contrary to Valdés's interpretation of our discussion of the § 1028A elements in Ozuna-Cabrera, the district judge's

instruction tracked the elements of the offense as defined in our Pattern Criminal Jury Instructions for the District Courts of the First Circuit and then provided our exact interpretation of the phrase "without lawful authority" from our holding in Ozuna-Cabrera. See 663 F.3d at 499. As with the instruction for bankruptcy fraud, the instruction for aggravated identity theft as a whole adequately explained the law and was neither confusing nor misleading to the jury. See Bauzó-Santiago, 867 F.3d at 23. We therefore see no error--obvious or otherwise.

## D. Sentencing Issues

As promised, we will now set out the details that are relevant to the sentencing issues Valdés raises for our consideration. The Presentence Report ("PSR") prepared by probation suggested the appropriate guidelines sentencing range ("GSR") pursuant to the November 1, 2014 Guidelines Manual. His sentencing hearing was first scheduled for August 6, 2015. The PSR set out the sentencing guidelines calculations for the bankruptcy fraud convictions (the most serious offense in the counts grouped together) as follows: A base offense level of 6 pursuant to U.S.S.G. § 2B1.1, with a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H) for the amount of loss greater than $400K, a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10) for the offense's use of sophisticated means, a 6-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C) for the number of victims

- 43 -

exceeding 250 and/or involving mass marketing, and a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9) for the offense involving a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding. This resulted in a total offense level of 30.

The PSR also requested restitution in the amount of $513,200 to the bankruptcy court, citing both 18 U.S.C. §§ 3663 and 3663A. This amount reflected the sum of the penalties as of June 30, 2015 imposed by two bankruptcy court judges in Chapter 13 proceedings for Valdés's failure to respond to several orders to show cause why he should not be sanctioned pursuant to 11 U.S.C. § 110 for violating the rules within which petition preparers must operate as well as for violating a bankruptcy court order prohibiting him from preparing petitions for bankruptcy court litigants.[18] While the initial penalties were imposed at a rate of $500 per case fraudulently filed, the order was subject to late fees at the rate of $500 per day that the total fine was not paid. $500 per day over the course of the two-and-a-half years which

---

[18] 11 U.S.C. § 110 sets out detailed rules for bankruptcy petition preparers as well as the multi-faceted consequences for breaking these rules that may be imposed by the bankruptcy court.

elapsed between the initial imposition of the fines and the day the PSR was filed added up to $513,200.

In Valdés's first set of objections to the PSR, he objected to the 6-level enhancement for the number of victims because he contends a lower enhancement was warranted because there was only evidence of 11 victims at trial. His total offense level, he says, should have been 26 instead of 30. He also objected to the proposed restitution by vaguely mentioning the imposition of an additional fine would be excessive. After the first objection to the PSR was filed Valdés changed attorneys, and his new counsel filed additional objections two weeks before his actual sentencing hearing. These objections basically mirror those originally filed by trial counsel. Regarding restitution, he argued:

> [R]estitution should be employed to compensate the so-called victims and not to enforce penalties or sanctions or debts. As a consequence, the defendant believes that it is unfair for him to be forced to pay what is clearly a debt in another forum and litigated elsewhere for an amount of $513,200 set as penalties by the Bankruptcy Court.

At the sentencing hearing, held on November 30, 2015, the district court grouped the bankruptcy fraud and wire fraud counts together, tracked the PSR's exact calculations, found the PSR "adequately applied the guideline computations," and concluded the resulting guidelines range was from 97 to 121 months. After adding the 24-month mandatory minimum for the aggravated identity theft convictions and considering the applicable sentences for the

destruction, alteration, or falsification of records in bankruptcy counts and the contempt of court count, the district court imposed a 134-month term of imprisonment for all of the counts of conviction. The district court also imposed an order of restitution in the amount of $513,200 to the Clerk of Court for the District of Puerto Rico.

## 1. Guidelines Sentencing Range

Valdés now asserts the district judge used the wrong version of the United States Sentencing Commission's Guidelines Manual, resulting in a total offense level that was six points higher than it should have been. Because the sentencing hearing occurred after the 2015 Guidelines Manual took effect (on November 1, 2015), he asserts the district judge should have sentenced Valdés under the amended guidelines. While the district judge claimed to use the November 1, 2015 Guidelines Manual to calculate the applicable offense level, it decidedly did not and the government concedes the error. Unquestionably, the number of levels added to the base offense level for the amount of loss pursuant § 2B1.1(b) decreased between the 2014 and 2015 Guidelines Manuals, and the district judge clearly used the loss table in the 2014 Guidelines Manual.

Valdés says two errors occurred as a result of applying the wrong Guidelines Manual to the calculation of the GSR: first, he was assigned two additional levels pursuant to the loss amount

under § 2B1.1(b)(1) and second, he was assigned four additional levels pursuant to the number of victims under § 2B1.1(b)(2). He argues that because the 2015 Guidelines Manual introduced a substantial financial hardship consideration under § 2B1.1(b)(2),[19] the Government hasn't yet borne its burden for this new consideration. Valdés argues all four prongs of plain error are met and that we should remand for re-sentencing to correct the error. For its part, the Government argues there is a reasonable likelihood of the same sentence being imposed if we remand because it believes the district court will enhance the base offense level by the same number of levels even under the revised versions of the Guidelines Manual.

---

[19] The 2015 Guidelines Manual, § 2B1.1(b)(2) provided:

(2) (Apply the greatest) If the offense—
(A) (i) involved 10 or more victims; (ii) was committed through massmarketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;
(B) resulted in substantial financial hardship to five or more victims, increase by 4 levels; or
(C) resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.

The 2014 Guidelines Manual, § 2B1.1(b)(2) provided:

(2) (Apply the greatest) If the offense—
(A) (i) involved 10 or more victims; or (ii) was committed through massmarketing, increase by 2 levels;
(B) involved 50 or more victims, increase by 4 levels; or
(C) involved 250 or more victims, increase by 6 levels.

While Valdés did object to the initial PSR's suggestion of adding 6 levels to the number of victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) and argues again to us that only 2 levels should be added for 10+ victims, the discussion in his brief concedes plain error review applies to his sentencing arguments.[20]

The Guidelines Manual instructs district courts to apply the version in effect at the time of sentencing unless doing so would raise ex post facto concerns. United States v. Rodriguez, 630 F.3d 39, 42 (1st Cir. 2010); see also 18 U.S.C. § 3553(a)(4)(A); U.S.S.G. § 1B1.11 (policy statement). The trial court therefore erred when it used the 2014 Guidelines Manual instead of the 2015 Guidelines Manual which contained amendments to two of the sections in play for Valdés's sentencing. The error was obvious because the new Guidelines Manual went into effect on November 1, 2015, and the sentencing hearing occurred on November 30, 2015. "[G]iven an error that is plain (although admittedly not called to the district judge's attention), we must ask whether there is reasonable likelihood of a different result if we remanded and whether there is also a threat of injustice if we affirm." Rodriguez, 630 F.3d at 42-43.

---

[20] Please excuse our redundancy, but we put in a quick reminder that, under the exacting plain error standard, Valdés "must show an error that was obvious and that not only likely affected the result in the lower court but also threatens a miscarriage of justice if not corrected." United States v. Rodriguez, 630 F.3d 39, 41 (1st Cir. 2010).

- 48 -

Here, the trial judge's clear error affected Valdés's substantial rights because it affected both the calculation of the applicable GSR and the ultimate imposition of the sentence of incarceration. See United States v. Figueroa-Ocasio, 805 F.3d 360, 373 (1st Cir. 2015). The trial judge calculated a total offense level of 30. When this is combined with a criminal history category of I, the guidelines range is 97-121 months.

In 2015, the Guidelines Manual changed the loss amount ranges in § 2B1.1(b) and incorporated a "substantial financial hardship" consideration to the determination of the number of victims for the specific offense characteristics under § 2B1.1(b)(2). The trial judge added 14 levels pursuant to § 2B1.1(b)(1) for a loss amount greater than $400,000 but less than $1,000,000. Under the amendments to this section effective November 1, 2015, only 12 levels should have been added for a loss amount greater than $250,000 but less than $550,000. In addition, because the substantial financial hardship was a new element in the calculation of the GSR, the trial judge did not consider it and we will not consider it in the first instance. Without a finding of substantial financial hardship, only 2 levels would be added pursuant to either § 2B1.1(b)(2)(A)(i) or (ii) for 10+ victims or if the offense was committed through mass-marketing.

These two amendments to the Guidelines Manual in 2015 could therefore have resulted in a drop of 6 levels to the total

offense level.  A total offense level of 24 with a criminal history category of I yields a range of 51-63 months.  There was no indication in the sentencing hearing that the trial judge intended to impose an above-guidelines sentence, so even if the trial judge imposed the top of the range, Valdés's total sentence of incarceration would have been 87 months (when the 24-month mandatory minimum for aggravated identity theft is added).  This represents a difference of 47 months or almost four years of incarceration.  Because "but for the error, there is a reasonable likelihood that the sentence would have been shorter," the sentencing error affected Valdés's substantial rights.  Figueroa-Ocasio, 805 F.3d at 373 (citing United States v. Ortiz, 741 F.3d 288, 293-94 (1st Cir. 2014)).

That leaves the fourth prong of plain error review-- whether the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  Figueroa-Ocasio, 805 F.3d at 367-68 (quoting United States v. Borrero-Acevedo, 533 F.3d 11, 15 (1st Cir. 2008)) (alteration in original).  The Supreme Court has recently made this an easy decision for us.  In Rosales-Mireles v. United States, 138 S. Ct. 1897, 1911 (2018), the Court held that, "[i]n the ordinary case, . . . the failure to correct a plain [g]uidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings."  According to the Court's

discussion in Rosales-Mireles, Valdés has met his burden to persuade us that the district court's error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" by proving a clear error that affected his substantial rights. See id. at 1909 n.4. Even without the Court's recent discussion and holding, we have tended to take the approach of remanding for resentencing when the correction of an obvious error in guidelines calculations would lead to a lower sentence. See Figueroa-Ocasio, 805 F.3d at 373-74. We therefore vacate Valdés's sentence and remand to the district court with instructions to re-sentence Valdés using § 2B1.1(b) in effect at the time of sentencing.

## 2. Restitution

Valdés also argues for the first time before us that the bankruptcy court is neither a proper recipient of restitution nor a victim pursuant to either 18 U.S.C. §§ 3663 or 3663A.[21] He also renews his argument that restitution is a duplicative collection effort for the fines imposed by the bankruptcy court, asserting that the district court committed clear legal error by ordering payment of these fines in the form of restitution. In addition, he vaguely mentions the restitution ordered resulted in an

---

[21] Valdés does not challenge the amount of restitution imposed.

- 51 -

excessive fine in violation of both the Eighth Amendment and of due process principles.[22]

The government responds that the bankruptcy court was properly identified as a recipient of restitution because Valdés has not yet paid the fines levied by the bankruptcy court. And because the bankruptcy cases underlying the fines imposed by the bankruptcy court are closed, the only existing avenue for collecting on the outstanding fines is to enforce the district court's order of restitution.

While Valdés filed written objections to the PSR challenging the probation office's restitution recommendation as an impermissible and duplicative collection effort, he did not voice any such objections during the sentencing hearing. The district court imposed restitution at the end of the hearing after the government reminded the court that restitution had been proposed in the PSR. Valdés remained completely silent through this part of the hearing even when the government asserted that Valdés had no objection to the restitution and when the district judge asked if there was anything else from the parties prior to adjourning the hearing.

---

[22] To the extent that Valdés suggests a violation of his constitutional rights, these arguments are waived for failure to develop them. After mentioning the excessive fines and due process clauses, he doesn't develop any meaningful argument with respect to either. See Echevarría, 856 F.3d at 139; Zannino, 895 F.2d at 17.

Valdés arguably withdrew his objection to the use of restitution to enforce his unpaid fines in bankruptcy court by remaining silent during the sentencing hearing instead of pressing the objection he had included in his written response to the PSR. See United States v. Alphas, 785 F.3d 775, 784 (1st Cir. 2015) ("In the sentencing context, an appellant may waive an issue when he initially raises it as an objection to the [PSR] Report but later explicitly withdraws the objection. . . . Once an issue is waived, there is nothing for an appellate court to review."). However, because we review claims of error in the sentencing process for plain error when a defendant does not lodge an objection during sentencing, United States v. Vázquez-Larrauri, 778 F.3d 276, 291 (1st Cir. 2015), as well as when we forgive waiver because "justice so requires," United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011), we will simply deem all of Valdés's arguments against the restitution order to be forfeited. We'll therefore proceed with a plain error analysis.

When the district court ordered restitution, it did not specify whether the order was made pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, or the discretionary restitution statute authorized by § 3663. The PSR makes reference to both statutes: one section states the MVRA applies to Valdés's fraud offenses before summarizing the Assistant U.S. Trustee's victim impact statement. Another section

says that the discretionary statute authorizes restitution in this case.

"Restitution serves as a mechanism for making a victim whole by restoring the monetary equivalent of losses suffered in consequence of the defendant's criminal activity." United States v. Salas-Fernández, 620 F.3d 45, 48 (1st Cir. 2010) (citing United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008)). The MVRA mandates restitution to the victim or victims of several different types of offenses, including "offense[s] against property under [title 18] . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). While we don't know whether the district court intended to impose mandatory or discretionary restitution, there is no doubt that at least one of Valdés's offenses of conviction--wire fraud--falls within the MVRA. See United States v. Stoupis, 530 F.3d 82, 84 n.4 (1st Cir. 2008) ("The MVRA requires courts to order restitution in connection with certain specific types of crimes, including offenses against property under title 18[, including] convictions under . . . § 1343."); see also United States v. Cutter, 313 F.3d 1, 6 (1st Cir. 2002) ("For fraud offenses, such as [concealing assets in bankruptcy proceeding in violation of 18 U.S.C. § 152(a) and one count of making a false oath in bankruptcy in violation of 18 U.S.C. § 152(2)], the [MVRA] governs restitution."). Even if Valdés is correct that restitution would not have been proper under

the discretionary statute, the restitution was proper pursuant to the MVRA.

Valdés's argument that the bankruptcy court cannot be a recipient of restitution has no merit. We have said that the federal government can be a victim for purposes of restitution. United States v. Mei Juan Zhang, 789 F.3d 214, 217 (1st Cir. 2015) ("We join our sister circuits in holding that the United States may be a 'victim' for purposes of the MVRA. The district court did not err in ordering restitution to the IRS."); see also United States v. Gibbens, 25 F.3d 28, 32 (1st Cir. 1994). The bankruptcy court is obviously a part of the federal government. Valdés relies on cases that are inapposite because they are based on situations in which a bankruptcy trustee has or has not been deemed the proper recipient of restitution upon a conviction for bankruptcy fraud. The subject of the restitution order here is the court,[23] not the bankruptcy trustee or the U.S. Trustee.

Valdés's argument that the bankruptcy court is not a victim for restitution as defined in both the MVRA and in the

---

[23] We note that while the government requested restitution for the bankruptcy court, the judgment lists the clerk of court for the district court as the recipient of the restitution. Neither party brings this factual discrepancy to our attention and, even if they had, this detail makes no difference because the bankruptcy court is a part of the district court and the district court has jurisdiction over all cases under title 11. See 28 U.S.C. § 1334.

discretionary statute fares no better. For purposes of restitution, "victim" is defined as follows:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. §§ 3663(a)(2), 3663A(a)(2). The Assistant U.S. Trustee's victim impact statement, as summarized in the PSR, details the ways in which the bankruptcy court was directly and proximately harmed by Valdés's fraudulent use of the bankruptcy system to perpetrate his scheme. The harm stems from the waste of the court's already scarce resources to process the skeletal petitions filed for the sole purpose of taking advantage of the automatic freeze on ASUME's collection efforts that he knew the petitions would generate. The harm also resulted from the time and resources used by the court in its attempts to stop Valdés, including drafting motions, investigating complaints by his clients, and gathering data to show how many fraudulent, skeletal petitions had been filed. Certainly then, on plain error review, it is fair to treat the restitution order, the amount incidentally mirroring the bankruptcy court fine, as having been imposed as a rough estimate of the amount of the losses incurred from the costs imposed on the bankruptcy court while it dealt with the added administrative burden resulting from the fraudulent filings rather than simply as

a penalty.  It's also fair to conclude on plain error review that these added burdens could be losses subject to restitution given that resources were fraudulently diverted from the regular administration of the bankruptcy court.  Therefore, this case is distinguishable from Gibbens, relied upon by Valdés, because the bankruptcy court incurred losses in the ordinary course of managing its operations and not, as Valdés contends, during a discrete investigation into his misuse of the bankruptcy system.  See 25 F.3d at 33 (government agency may not recoup money lost as a consequence of a crime via a restitution order pursuant to Victim and Witness Protection Act when losses incurred by an undercover investigation provoked the commission of the crime at issue).

Finally, Valdés's claim that affirming the order of restitution will allow the court to collect twice on his fines is completely without merit.  First, there is no suggestion that the government has attempted to enforce the collection of the fines through the bankruptcy court cases.  Second, once Valdés pays his restitution, he may move to reopen any of the bankruptcy cases in which a fine has been imposed and request that the court enter an order stating the fines have been satisfied.  See 11 U.S.C. § 350 ("A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.").  To that end, the government's contention that, because the underlying bankruptcy cases are closed, the only way it will

be able to collect the unpaid fines is through enforcement of the restitution order is also not accurate. But be that as it may, the order will not result in double dipping.

Valdés has therefore not shown that the district court committed any errors, never mind a clear or obvious one, when it ordered restitution to the clerk of court for the district court.

### III. CONCLUSION

To sum everything up, we affirm Valdés's convictions and the order of restitution but vacate his term of incarceration and remand for resentencing using the proper version of the Guidelines Manual.